Durfee, Judge,
delivered the opinion of the court:
Plaintiff filed a petition in this court on May 17, 1958, claiming breach of contract by defendant. Defendant awarded Contract No. QM-7726 OI-2391-E-56 to plaintiff on April 26, 1956, for the manufacture of 350,000 canteen covers lined with felt. The canteen covers were to be made pursuant to certain specifications, which included a specific requirement that the felt used in making the product meet certain tests with respect to mildew resistance, and a requirement that the felt contain one of two specified chemicals, in specified amounts, as mildew resistant treatment. The issues of liability and damages have been separated, and by agreement of all concerned, the trial in the first instance was limited to the issues of law and fact relating to the right of the plaintiff to recover.
Plaintiff actually bid for the manufacture of 760,000 dismounted canteen covers. Bids were opened February 21, 1956, and on February 24 the contracting officer requested a preaward plant survey in connection with plaintiff’s bid to deliver 760,000 canteen covers, scheduled monthly for the *615 period of June to October, 1956. Apparently based upon information developed during such survey, tbe plaintiff was only awarded a contract to manufacture 350,000 canteen covers, with deliveries to be made in specified quantities monthly between July 25 and November 24, 1956. Plaintiff protested the reduction in volume made by defendant. Both the invitation and the award provided that defendant reserved the right to make an award for a quantity less than the amount bid upon at the unit price offered. Plaintiff agreed to accept an award for 350,000 units.
On May 28,1956, plaintiff entered into a sub-contract with Crown Canvas Products, Inc., whereby the latter corporation agreed to finance and manufacture the 350,000 canteen covers under prime contract QM-7726 OI-2391-E-56.
Plaintiff withdrew its protest concerning the reduction in the number of canteen covers involved in the original invitation and bid after plaintiff had negotiated a separate contract with defendant numbered QM-7796 OI-2567-E-56 for an additional 89,000 canteen covers dismounted.
The award to plaintiff provided that preproduction samples would be required. The samples, including such component parts as felt, thread, snaps, and hardware, were required for specification tests to be conducted by defendant. No similar tests were made by plaintiff.
Plaintiff was late in delivering under the contract schedule. After two contract modifications, extending the times for plaintiff’s performance, and a partial termination of the contract on May 7, 1957, which reduced the total number of covers due under the contract from 350,000 to 284,500, plaintiff actually delivered 251,600 canteen covers under Contract QM-7726 before the contract was terminated by defendant for default on June 5, 1957. The contract provided that if the termination was for default, and plaintiff’s failure to make deliveries was due to causes which were excusable under the contract terms, the termination would be deemed to have been accomplished for the convenience of the Government. The record in this case does not establish that plaintiff’s delays in furnishing the required type of felt and failure to complete deliveries called for by the contract fall within *616 a category which would warrant a finding that they were or can be classified as excusable.
Plaintiff’s position is that defendant breached the contract by improperly rejecting certain lots of felt delivered by plaintiff, so that plaintiff’s costs of production were increased and it was delayed so that it was unable to produce the total quantity of covers called for in the contract. Plaintiff says that the rejections were unjustified because they were the result of defendant’s subjecting the felt to certain tests which had not been specified in the contract. Plaintiff has failed to prove that there was a breach of the contract by defendant. Under a proper interpretation of the contract terms, the defendant could reject felt offered by plaintiff for use in making the canteen covers if such felt did not meet the specifications for mildew-inhibitor content or was otherwise shown to be unacceptable by reasonable and necessary tests. The tests for content and percentage concentration of mildew inhibitor were both reasonable and necessary and were accomplished in such a manner as not to unduly delay the work. Plaintiff’s contention is that, since only one method of testing the felt is spelled out in the specifications for testing one element of the product (mildew resistance) the defendant is precluded from testing the product for another specified element (mildew-inhibitor content). The court does not accept this view. Plaintiff offered no evidence which shows or tends to establish that any one of the various lots of felt rejected by defendant, in fact contained the specified mildew-inhibitor content. No tests of the type generally recognized as proper and necessary in such instances were made by plaintiff or its supplier. Plaintiff’s expert witness on this subject testified that the tests made by defendant were standard procedure and were tests generally accepted and were “common practice in any laboratory.” Plaintiff has not challenged the accuracy of such tests, the manner in which they were performed, or the results obtained. The fact that the contract specified a test for mildew-resistance in no way precluded defendant from making whatever tests were necessary for determining whether the felt complied with another element of the contract specifications, a prescribed mildew-inhibitor content. It would be meaningless for the contract to provide *617 a specific chemical content for the felt, while at the same time precluding the making of such tests as were necessary to determine if that content were actually present.
Plaintiff did not raise the objection that the tests were not specified and therefore unauthorized by the contract during the period of the contract. When notified that certain lots of the felt in question were unacceptable, plaintiff initiated negotiations for a reduction of its contract price, without questioning defendant’s right to reject. By this conduct, plaintiff accepted the defendant’s interpretation of the contract and specifications as to tests of the felt being furnished.
In Central Engineering and Construction Co. v. United States, 103 Ct. Cl. 440, 465, this court said:
The contracting officer and the head of the department agreed with plaintiff’s interpretation of the intent and meaning of the specifications and drawings, and any ambiguity which might otherwise appear on the face of .the documents is therefore now of no moment. The interpretation of a contract by the parties to it before it becomes the subject of controversy is deemed by the courts to be of great, if not controlling, weight.
Plaintiff contends that defendant was responsible for the delays and defaults in the delivery of canteen covers, by reason of having unduly delayed the issuance of laboratory reports on the tests of felt samples. We think that the record establishes that plaintiff was responsible for most of the delay incident to the performance of the contract simply because plaintiff repeatedly accepted felt from its supplier, Western Felt Works, which failed to meet the requirements of the contract and specifications. Following each of several rejections by defendant, the supplier continued to assure plaintiff that its next shipment of felt would measure up to the Government’s requirements. The goal was never realized. Plaintiff ultimately ceased to make protests to its supplier with respect to the quality of the felt being supplied and never made a change in its source of felt. It could have obtained felt from another supplier at considerably less cost, but did not elect to do so.
The fact is that from a total of 12 samples from numbered lots submitted to defendant during the period from June 18 *618 to December 31, 1956, only two (lots 3 and 6) met the minimum requirements of 1 percent of 2.2 dihydroxy-5.5 dichloro-diphenyl methane or % percent of salicylanilide (finding 19).
Each time plaintiff was notified of the rejection of felt submitted to defendant, plaintiff would discontinue manufacturing canteen covers by use of such felt until it was notified that the felt would be accepted at a reduced price. After agreement of the parties as to the reduced price, plaintiff would resume work under the contract. Plaintiff made its final delivery on May 14, 1957, having delivered a total of 251,600 canteen covers up to that time. Plaintiff was unable to complete the contract. On June 5,1957, the contract was terminated for default.
Plaintiff appealed from the decision of the contracting officer terminating the contract for default, and contended before the Armed Services Board of Contract Appeals that plaintiff’s delay was excusable on the grounds that the felt submitted met the contract specifications and that defendant took an unreasonably long time in accepting (at a lower price) the felt that did not conform to requirements of the Government. The Board denied the appeal and found that (1) the contract was terminated for default, (2) the failure to perform the contract was not beyond the control or without fault or negligence on the part of plaintiff, and (3) plaintiff’s failure to perform the contract in the time originally allowed, plus an extension of five months allowed by defendant, “was directly attributable to appellant’s continued submission of nonspecification material” (finding 61). That determination by the Armed Services Board of Contract Appeals was not arbitrary or capricious and is supported by substantial evidence.
Counsel for defendant has set forth other bases for possible denial of plaintiff’s right to recover. It is not deemed necessary to enter into a detailed discussion of these matters in view of our conclusion that plaintiff is not entitled to recover.
Defendant has also asserted two counterclaims. However, as has been stated above, the parties have agreed that the trial of the case in the first instance be limited to the issues of law and fact with respect to plaintiff’s right to recover. Having determined that plaintiff is not entitled to recover, *619 we return the case to the trial commissioner for further proceedings with respect to the defendant’s right to recover on its counterclaims.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge, and J ones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was at all times hereinafter mentioned a New York corporation with its office and place of business at 105 East 16th Street, New York City. By agreement of all concerned the trial in the first instance has been limited to the issues of law and fact relating to the right of plaintiff to recover.
2. Under date of February 20, 1956, plaintiff, following receipt of an invitation of the Philadelphia Quartermaster Depot issued January 31, 1956, bid at certain unit prices varying from 66 cents per unit for the manufacture of 160,000 dismounted canteen covers to 57.5 cents per unit for 300,000 such canteen covers, and specifying 350,000 at 58.5 cents per unit. Plaintiff further agreed to accept an award of not less than 300,000 covers at 57.5 cents per unit. All items involved in these bids were to be produced according to military standards, military specifications, and Federal specifications.
3. On February 21, 1956, the bids were opened. On February 24, 1956, the contracting officer who had been assigned to the invitation, prospective award, and contract, Capt. E. B. Hersh, QMC, United States Army, requested a pre-award plant survey in connection with plaintiff’s bid to deliver 760,000 canteen covers, dismounted, scheduled monthly, June to October 1956. At that time plaintiff was behind schedule in deliveries on two other Government contracts involving approximately 38,000 convalescent slippers.
4. On March 1, 1956, Albert Stanford, a production facilities specialist with the Philadelphia Quartermaster Depot, made a preaward survey of plaintiff’s plant at 105 East 16th *620 Street, New York City. He found that plaintiff had no prior canteen-cover production experience and lacked needed equipment. Stanford reported that plaintiff stated it would procure from named suppliers necessary heavy duty sewing machines, “bartack” machines, additional Singer sewing machines and tables, snap fastener machines, hooks, and packing material. Assuming that the contractor’s material and equipment, the Government-furnished material (GFM), 45 basic machines, and related equipment were in the plant by May 15,1956, it was Stanford’s opinion that plaintiff’s probable production, at 100 units per machine per day, would be 90,300.
5. On April 26, 1956, defendant notified plaintiff by telegram that it was awarded 350,000 canteen covers, dismounted, on Invitation QM-36-030-56-408, the notice being considered as a binding contract, with a formal contract to follow. The contract was numbered QM-7726 OI-2391-E-56.
6. Following receipt of the telegraphic notice of award dated April 26, 1956, plaintiff protested to defendant by telephone, in person, and in writing because it had not been awarded a contract for the entire 760,000 units on which it had submitted bids.
Both the invitation for the bid and the award specifically provided that the Government reserved the right to make an award for a quantity less than the quantity bid upon at the unit price offered. Plaintiff had specifically bid for 350,000 at a unit price of 58.5 cents and agreed in writing to accept an award for a quantity less than 760,000 units and more than 300,000 units, i.e., 350,000 units.
7. During the course of plaintiff’s protest with respect to the number of units in the award, its corporate officers and attorney had meetings with the contracting officer, Maj. E. B. Hersh, and his military superiors, including the Commanding General of the Philadelphia Quartermaster Depot, General Webster Anderson, the last meeting being held in Philadelphia on May 8, 1956. Before that meeting, Sam Weiner, secretary of plaintiff, had prepared a letter addressed to General Hastings, Quartermaster General in Washington, in which plaintiff’s version of the circumstances of the award and plaintiff’s protest were discussed. At the meeting Gen *621 eral Anderson, who had not been shown plaintiff’s letter, stated nothing could be done to change the award, and advised plaintiff’s representatives to “crawl before you run.” After the meeting, an officer of the plaintiff’s corporation handed the letter to Major Hersh, who read it and returned it without comment. The letter was not sent to the Quartermaster General. On May 10,1956, General Anderson wrote plaintiff confirming the award as made which created contract No. QM-7726, and denying favorable action on plaintiff’s protest.
8. During the two weeks between April 26 and May 10, 1956, plaintiff did not place an order for the felt material required for the canteen covers, and did not withdraw its protest until June 11, 1956. The protest was withdrawn after plaintiff had successfully negotiated a contract with Major Hersh numbered QM-7796 OI-2567-E-56 for 89,000 canteen covers, dismounted.
9. Plaintiff did not occupy more than one fifth of the three floors which it had been renting at 105 East 16th Street, New York City, subsequent to April 30,1956. In December 1955, Morris and Sam Weiner, president and secretary, respectively, of plaintiff, due to financial difficulties of plaintiff, had organized a separate corporation, known as Crown Canvas Products, Inc. After award of negotiated contract No. QM-7796 for the 89,000 canteen covers, Crown Canvas Products, Inc., succeeded in leasing space at 30-32 West 13th Street in New York City.
On May 28,1956, plaintiff entered into a subcontract with Crown Canvas Products, Inc., whereby the latter corporation obligated itself to finance and manufacture the 350,000 canteen covers under prime contract No. QM-7726.
10. On June 1,1956, Sam Weiner telephoned Major Hersh requesting permission to use additional space at 30-32 West 13th Street for storage of GFM. Major Hersh then made request of the Quartermaster Industrial Mobilization Unit to survey those premises for storage purposes. Under date of June 6,1956, plaintiff sent defendant the following letter:
This is to confirm our telephone conversation of Friday, June 1st notifying you that we have secured additional space at 30-32 West 13th St; N.Y.C. for the manufacture of subiect item under above noted contracts.
*622 We would appreciate it if you were to notify the depot to forward all Government Furnished Material to 30-32 West 13th St; New York City in order to facilitate the manufacture of subject item.
Following receipt of plaintiff’s letter, Major Hersh requested the Industrial Mobilization Unit to survey the West 13th Street premises for manufacturing and storage purposes. He also made inquiry of plaintiff by letter as to the reason for additional space, inquiring about a possible change in the shipping and inspection point at 16th Street, length of lease, and GFM insurance. Plaintiff’s reply was as follows:
Replying to your letter of 12 June 1956 regarding the additional space we secured at 30-32 West 13th Street, N.Y.C. for the manufacture of Covers, Canteen, Dismounted, M-1910 under referenced contracts, you are advised as follows:
a. Entire quantities are to be manufactured at new location for both contracts.
b. Inspection and shipping are to be performed at 30-32 West 13th St; N.Y.C.
c. We have lease on premises at 30-32 West 13th St. until January, 1957 with a five year option.
d. Insurance policies covering government furnished material have already been forwarded to your office.
e. The acquisition of additional space at 30-32 West 13th St; N.Y.C. will insure prompt deliveries, permit acceleration of deliveries as requested in Invitation to Bid, and will result in no additional cost to the government.
11. After receiving a favorable report on the West 13th Street premises for storage purposes, defendant notified plaintiff of authority to use those premises for storage of GFM and for the manufacture of canteen covers.
12. Although plaintiff had ordered from Western Felt Works 4,000 yards of felt scheduled under contract QM-7726 for manufacture of 43,742 canteen covers, Western Felt delivered only 2007% yards, invoiced in two lots of 139514 and 612% yards, to Crown Canvas Products, Inc. This delivery was made to 30-32 West 13th Street on June 15,1956.
13. The contracting officer wrote Western Felt Works on June 22, 1956, referring to both contracts QM-7726 and QM-7796, and requesting an early reply to his query of the *623 exact date the order for felt was received and the date the order was filled and shipped. Western Felt’s sales manager, R. H. Bntz, replied on July 3,1956, as follows:
An order was placed with ns by Crown Coat Front Co. Inc., 105 East 16th Street, New York, N.Y. on May 10 under contract reference QM-7726 OI-2391-E-56.
This order did not specify the full quantity of Felt required for the fulfillment of this contract. It did specify 8,000 square yards. Of this quantity 4,000 square yards were shipped June 8,1956.
The remaining 4,000 square yards have been manufactured and are held in our stock awaiting shipping instructions.
Western Felt’s letter was inaccurate in stating (1) that the order specified 8,000 yards, and (2) that 4,000 yards were shipped.
14. The award to plaintiff under date of April 26, 1956, provided that “[p] reproduction samples will be required.” Such samples were for specification testing by the Government and were known as component parts, i.e., felt, thread, snaps, and hardware. Having received no samples as required by the award, the contracting officer wrote plaintiff under date of June 21,1956, as follows:
This will confirm telephone conversation with you on 20 June 1956 relative to performance under your contracts.
Information available at that time indicated that contractor furnished components had not yet been received by the Quartermaster General Testing Laboratories and, as you were informed, approval on all components must be received before they can be accepted in the manufacture of a specification item. You indicated that samples of the hardware and felt were submitted approximately one week ago for testing and that a sample of the thread was submitted as of 19 June. It would appear that your firm has not taken the proper steps to submit components for Laboratory testing, especially in view of the fact that contract QM-7726 was awarded on 26 April 1956 and contract QM-7796 was awarded on 14 May 1956.
Your attention was called during this telephone conversation to the letters sent you shortly after award of these contracts, in which it was outlined that contractor furnished components should be submitted without de *624 lay in order tbat delivery schedules might be fully met. Adequate time must be allowed for testing of all components in accordance with the applicable specification, and it is incumbent upon the contractor to submit contractor furnished components in sufficient time to assure the Government and himself that these components meet all specification requirements. You have evidently not taken this into consideration in the submittal of your components and therefore any delays as a result thereof will not be considered as excusable and beyond your control.
As you were reminded, you will be held strictly responsible for meeting all requirements of your contract, and especially the delivery schedules as set forth therein.
Your attention is again called to a preproduction sample as required by the contracts, and which was discussed with you several days ago. At that time you stated that a preproduction sample would be completed before the end of this week.
Any delay on your part in complying with the requirements of submitting samples of contractor furnished components and preproduction samples may jeopardize your performance and ability to comply with delivery schedules. Such delays will not be considered as excusable on your part.
15. MIL-M-2312, Military Specification, Mildew Resistance and Moisture Resistance Treatment for Felt, which was in effect during the life of contract QM-7726, provided in pertinent part as follows:
B. Ttpes
B-l. This specification covers three types of treatment as follows:
Type I — Mildew resistant treatment.
Type II — Moisture resistant treatment.
Type III — Mildew resistant and moisture resistant treatment.
C. MATERIAL AND WORKMANSHIP
C-l. Material. — All materials used in treatment of the felt shall be manufactured by standard commercial methods. All chemical reactions shall be complete.
C-2. Workmanship. — Treatments shall be in accordance with good commercial practice, and shall thoroughly penetrate the material treated to meet the concentration and performance requirements hereinafter specified.
*625 D. General Requirements
D-l. Treatments shall conform to the following requirements :
D-la. Penetration. — The treatment shall be of the penetrative type which will thoroughly and uniformly impregnate the felt.
D-lb. Flexibility. — The treatment shall not materially affect the flexibility of the felt.
D-lc. Absorption. — The treatment shall not add any hygroscopic qualities to the felt.
D-ld. Durability. — The treatment shall not dust off under service conditions.
E. Detail EequieemeNts
E-l. Type /, Mildew resistant treatment.—
E-la. Unless otherwise specified in invitation for bids, contract or order, the felt shall contain one of the following materials, in the amount indicated, calculated on the dry weight of the finished felt:
From 1 to 2 percent of 2,2' dihydroxy-5,5' dichloro-diphenyl methane.
From y2 to 1 percent of salieylanilide.
E-lb. Efficiency of treatment. — The treated felt shall show no visible growth of mildew after being exposed to the mildew infection test specified in paragraph F-4.
E-2. Type II, Moisture-resistant treatment.—
E-2a. The felt shall be treated with suitable water-repellant materials which will enable the treated felt to meet the requirements specified herein.
E-2b. Efficiency of treatment. — Treated felts shall not show more than 50 percent increase in weight when tested in accordance with paragraph F-5.
E-3. Type III, Mildew-resistant and moisture-resistant treatment.—
E-3a. Felts shall be given both mildew-resistant and moisture-resistant treatments to meet the requirements specified in paragraphs E-l and E-2.
F. Methods oe Sampling, Inspection, and Tests
F-l. Sampling. — Samples for tests shall be taken at regular production intervals as indicated by the contracting officer, so that at least one complete series of tests will be made for each lot of treated material.
F-la. Each sample of treated felt shall be a strip not less than 6 inches wide, cut across the width of the sheet. The area of the sample shall not be less than 288 square inches.
F-lb. A lot, for the purpose of inspection and test shall consist of all felt of the same material, type, and *626 size, treated in the same plant and by the same process, and submitted for acceptance at the same time.
F-2. Inspection. — Unless otherwise specified in the invitation for bids, contract or order, inspection shall be made at the point of final treatment, by authorized Government inspectors who shall be afforded all facilities by the contractor, conducting the required tests. If the contractor has no facilities for making the required tests, the tests shall be performed by an approved laboratory at the expense of the contractor and under Government supervision.
F-3. Tests. — Shall be as hereinafter specified.
F-4. Test for efficiency of mildew-resistant treatment.
[Then follows a technical description of preparation of test cultures.]
F-5. Test for efficiency of moistureproofing treatment.—
[Then follows a technical description of the immersion test.]
‡ «K $ ‡ #
H. Notes
H-1. The specified tests for mildew resistance are for the purpose of ascertaining whether the treatment has been applied properly, and are not considered as tests for evaluating mildew inhibitors. The Government reserves the right to specify, prohibit, or limit concentrations of chemical components of treatments herein specified for reasons such as toxicity, corrosive action on metals, or other considerations not covered by the requirements of this specification.
H-2. The use of this specification, wherever applicable is mandatory on all procuring agencies of the Army.
16. The contract provided that the felt to be supplied by plaintiff for the canteen covers was to conform to Federal Specification C-F-206a, Classification No. 925, felt, mechanical, roll, and receive Type III, mildew-resistant and moisture-resistant treatment under Military Specification MIL-M-2312 above described.
17. The contract provided as follows with respect to inspection and test of felt by the Government:
5. Inspection
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be sub *627 ject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided in the clause of this contract entitled “Default.” Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact Avithin the meaning of the clause of this contract entitled “Disputes.”
(g) * * * If Government inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government: Provided, That in the case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except *628 as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. * * *
18. Standard Government tests for efficiency of mildew-resistant treatment and for moisture-proofing treatment were conducted between June 18 and July 8, 1956, in the Philadelphia Quartermaster Depot Laboratory under MIL-M-2312. Defendant found from these laboratory tests that there were traces of mildew growth in the samples tested. Accordingly the contractor was informed that the samples of felt submitted failed to meet the contract requirements and the felt was rejected. Laboratory report 38949, rejecting plaintiff’s felt, was mailed to plaintiff under date of July 3,1956, but, due to a shutdown in the New York textile industry on July 4, 5, and 6 (Wednesday, Thursday, and Friday), plaintiff did not see the report until it re-opened its office on July 9,1956.
19. On July 6, 1956, the contracting officer called plaintiff’s plant manager, Mr. Friedman, by telephone and informed him of the deviations and rejection, and also confirmed the report by a letter, addressed to plaintiff on July 9,1956, as follows:
Confirming telephone conversation of 6 July 1956 with your Mr. Friedman, the following deviations from Military Specification MIL-C-1725A have been found as to the visual characteristics of preproduction sample of Cover, Canteen, Dismounted, M-1910 submitted under Contract QM-7726 OI-2391-E-56:
1. Stitching Defeats
(a) Loose tension, resulting in loosely exposed top thread on quilting stitch.
(b) One row of stitching omitted on side joining seam.
Note: There is a slight loose tension on sewing of darts.
*629 2. Reinforcement Hanger
(a) The cross stitching on reinforcement hanger is incomplete and should extend the full length of the box from inner edge to imier edge of box-stitching at corner.
(b) One additional row of stitches at each end of reinforcement.
(c) Two and a partial row both at bottom and top of reinforcement; should be 2 rows.
3. Markings
(a) Letters “US” very faint.
(b) Identification markings omitted.
These defects must be corrected in your production. It will not be necessary for you to submit another pre-production sample.
Except for deviations indicated above, preproduction sample of canteen cover conforms to specification requirements for visual and dimensional characteristics only.
Additionally, this will confirm that Laboratory lie-port No. 38949 reflected failures of felt tested under above referenced contract as follows:
1. Mildew inhibitor content:

Results Requirements

DDDM%: 0.4 Average_1 to 2% DDDM or % to 1%
Salicylanilide: None Found. Salicylanilide.
2. Mildew resistance:

Results Requirements

Myro: Trace-No visible growth.
A. Niger: Trace-No visible growth.
Penieillium: Trace_No visible growth.
This felt cannot be accepted.
20. On July 16, 1956, defendant received a letter from plaintiff, quoted, in part, as follows:
Eeference is made to indicated contracts listed above.
Pursuant to our telephone conversation of Friday, July 13,1956, this will confirm our agreement to accept a reduction of $.01 (one cent) per Unit due to the fact that your tests showed that the Felt did not come up to necessary standards. It is understood that this reduction will apply to all Canteen Covers made with Felt out of the shipment from which the samples were tested consisting of 50,000 Units. This 50,000 Units represents the cut Felt in our Plant and the balance of the shipment which Western Felt is holding.
Plaintiff received the following answer from the contracting officer dated July 17,1956:
*630 Reference is made to your undated letter received in this office on 16 July 1956, in which you advise that the felt, from which samples were tested and failed mildew inhibitor content and mildew resistance, will be used in 50,000 units.
It was the belief of this office that the felt was to be used under contract QM-7726 OI-2391-E-56. However, in your letter you referenced to the two contracts QM-7726 OI-2391-E-56 and QM-7796 OI-2567-E-56, which would indicate that you intend to use the felt in question under both contracts. If this is the case, it is requested that you give a detailed breakdown as to the exact number of units which will contain the deviating felt under contract QM-7726 OI-2391-E-56, and the exact number of units which will contain the felt under contract QM-7796 OI-2567-E-56.
Information as requested above is needed promptly, as your firm is now classified in the potential delinquency category.
You are advised that the use of the deviating felt in canteen covers is entirely at your own risk inasmuch as no advice as to acceptance of the deviation can be given at this time. Further consideration must be given to all factors including your price reduction offer of $.01 (one cent) per unit. You will be advised as soon as a decision is reached.
Upon receipt of the foregoing letter, plaintiff discontinued using the deviating felt.
21. The contracting officer followed the procedures set up by the Philadelphia Quartermaster Depot for the acceptance of deviations from specifications in the contract (QM-7726). These procedures were set out in a Manual of Policies and Procedures on the subject “Acceptance of Deviations from Specifications in Contract.” To obtain a report thereon the contracting officer was responsible for sending to the Quartermaster Research and Development Command at Natick, Massachusetts, full information, including the laboratory report already received from the Quartermaster Inspection Service Command, whereupon the Quartermaster Research and Development Command, upon study of the deviation and the offer of reduction in price, i.e., one cent per unit, recommended to the contracting officer acceptance of the deviation. Upon receipt of the Research and Development Command recommendation, the contracting officer was then *631 required to submit bis own recommendation of acceptance to the Deviation Eeview Board, and finally to the Quartermaster General in Washington, for approval. The contracting officer had orally explained to plaintiff that a determination with respect to the deviation and plaintiff’s offer of a one-cent reduction in price had to be made by a higher authority.
22. On August 8,1956, plaintiff was notified by defendant that the deviation and the one-cent price reduction were accepted.
23. Plaintiff reported that it had made up of the 2007% yards of deviated felt only 10,000 units, some of which were commenced and completed in August 1956, whereas the contract required deliveries of 43,742 units by July 25, 1956.
24. Under date of September 5, 1956, plaintiff had offered defendant a one cent per unit reduction in contract price on a second equivalent lot of 2004% yards, contingent upon receipt by plaintiff of a duplicate type rejection based upon testing at the Quartermaster Laboratory. Plaintiff emphasized that this procedure was being adopted because of its “desire to continue shipments,” but further stated that the offer would be withdrawn if the lot met the mildew specification and was accepted.
25. Upon submission on August 27,1956, of samples from this quantity of 2004% yards from lot 2, the Philadelphia Quartermaster Depot Laboratory, on September 12, 1956, reported DDDM mildew inhibitor of .48, .44, and .62 percent, or an average of .51 percent, against the contract requirement of 1 to 2 percent DDDM; and gave notice to plaintiff that the felt was, accordingly, rejected. Plaintiff now insists that, since there was no requirement for this test under the contract, the rejection by the defendant amounted to a breach of contract.
26. After receipt of the Quartermaster Depot Laboratory report (No. 4682-L), plaintiff reconsidered its contingent offer of September 5, 1956, of a one-cent reduction per unit on lot 2, and finally, on September 17, 1956, wired the contracting officer an offer of one-half cent per unit reduction in price. Since no mildew growth was shown, as had been *632 found on samples from lot 1, the contracting officer promptly accepted plaintiff’s offer.
27. On August 15, 1956, Crown Canvas Products, Inc., which, under subcontract with plaintiff, was doing all the ordering and manufacturing, had arranged with Western Felt Works to cut to pattern 200,000 sets of felt canteen liners, at its plant in Chicago, i.e., actually to deliver an integral part of the manufacture of the canteen covers; and Crown Canvas Products, Inc., confirmed this arrangement by written order of August 17,1956. This arrangement was never consummated, and subsequently Crown Canvas Products, Inc., decided it would do its own cutting of liners and placed an order under contract QM-7726 on September 25, 1956, for 15,000 yards of felt.
28. Crown Canvas Products, Inc., placed an order dated September 19,1956, with Western Felt for 4,000 yards of felt under contract QM-7726, with special instructions that the felt should be laboratory tested and approved under military specifications MIL-M-2312.
Under this third order for 4,000 yards, Western Felt invoiced to Crown Canvas Products, Inc., under dates of September 20, 21, and 24,1956,1330% yards of felt. From this quantity, numbered lot 3, plaintiff submitted samples to the Philadelphia Quartermaster Depot Laboratory which were reported on October 11, 1956, to be “acceptable with respect to Government laboratory test requirements,” but unsatisfactory with respect to weight per square yard, the samples averaging 1.78 against the contract requirement of 1.71.
Another 1480% yards of the 4,000-yard order of September 19, 1956, was invoiced by Western Felt to Crown Canvas Products, Inc., on September 27, 1956. Upon submission on October 3,1956, of samples from this quantity, numbered lot 4, the Philadelphia Quartermaster Depot Laboratory, on October 18, 1956, reported DDDM mildew inhibitor of .86, 0 and 0 percent, against a contract requirement of 1 to 2 percent DDDM; and 0, .50 and .45 percent, or an average of 40.8 percent against the contract requirement of % to 1 percent salicylanilide; also moisture content increase of 243.5, 163, and 160.7 percent, or an average of 189.1 percent *633 against the contract requirement of not more than 50 percent increase. Accordingly, plaintiff was notified that lot 4 was rejected.
29. On October 25,1956, Western Felt received in Chicago from Crown Canvas Products, Inc., a request for a test for moisture content and absorption on samples of lot 4 earmarked for canteen cover manufacture under contract QM-7796, and Western Felt addressed to the contracting officer in Philadelphia a letter reporting differing moisture content on three different samples, with an average of less than 50 percent. Meanwhile, plaintiff requested a re-test by the contracting officer (on samples of lot 4 under contract QM-7726). On samples for re-test received from plaintiff on October 29, 1956, under contract QM-7726, the Philadelphia Quartermaster Depot Laboratory on November 15, 1956, reported to plaintiff DDDM mildew inhibitor of 0, 0, and .90 percent, as against the contract requirement of 1 to 2 percent DDDM; and moisture content of 22.3, 39.7, and 263.8 percent, or an average of 108.6 percent moisture, as against the contract requirement of not more than 50 percent.
30. An adverse report was made to plaintiff on October 18,1956, with respect to lot 4. On November 6, 1956, plaintiff offered a price reduction of one-half cent per unit on this lot. Following manual procedures for acceptance of deviations, the contracting officer notified plaintiff on November 20,1956, of the acceptance of plaintiff’s reduction offer on lot 4.
31. There were 628*/2 yards of the 4,000-yard order of September 19, 1956, which Western Felt had invoiced to Crown Canvas Products, Inc., October 1 and October 12, 1956, yet to be processed. Upon submission on October 12, 1956, of samples from this quantity, numbered lot 5, the Philadelphia Quartermaster Depot Laboratory, on October 31, 1956, reported salicylanilide mildew inhibitor .34, .34, and .38 percent, or an average of .35 percent, against the contract requirement of % to 1 percent salicylanilide, and, accordingly, notified plaintiff that the felt was rejected. The results of the tests for weight per square yard and thickness in inches were also reported as unsatisfactory.
*634 On October 31, 1956, plaintiff, by letter-telegram, offered defendant a price reduction of one-half cent per unit on lot 5. The contracting officer notified plaintiff on November 7,1956, of the acceptance of the offer on lot 5.
32. On October 9 and 11, 1956, Western Felt invoiced to Crown Canvas Products, Inc., the balance of 902*4 yards of the 4,000-yard order of September 19, 1956. Upon submission, on October 17, 1956, of samples from this quantity, numbered lot 6, the Philadelphia Quartermaster Depot Laboratory, on October 31, 1956, reported lot 6 “acceptable with respect to Government laboratory test requirements.”
33. Beginning in September 1956, Crown Canvas Products, Inc., was using felt invoiced and shipped to it by Western Felt, and manufacturing it into canteen covers under contract QM-7796. This was done in order to complete manufacture and delivery to defendant of 89,000 units under contract QM-7796, and to avoid threatened termination by defendant of that contract, negotiated in May 1956. Plaintiff gave priority to the manufacture and deliveries under contract QM-7796 because it was being urged to complete that contract within the time allowed by the defendant for its completion. This caused further delay on the part of plaintiff and its subcontractor, Crown Canvas Products, Inc., in manufacturing and delivering canteen covers under contract QM-7726.
34. Under date of October 2, 1956, pointing out that, in accordance with Government specification requirements, it had to submit untreated felt for Government inspection, plaintiff requested Western Felt to forward with every shipment of treated felt four samples of untreated felt. Under date of October 5, 1956, Western Felt Works wrote plaintiff as follows:
Against your order for 15,000 yards of canteen felt we will comply with your October 2 request to furnish four samples 12" x 72" with each shipment. These samples will be plain felt — not treated.
Since all of the felt for the 4,000 yard order of 64" width has been processed, it will not be possible to furnish untreated samples.
*635 No evidence was offered to establish that Western Felt ever furnished plaintiff with samples of untreated felt, as required by MIL-M-2312, paragraph F-4f, controls.
35. On September 25,1956, Western Felt entered an order for 15,000 yards of felt as sold to Crown Canvas Products, Inc., under contract QM-7726, indicating that the felt must be laboratory tested and approved before cutting into widths. On October 8, 1956, Western Felt sent its acceptance of the order as from Crown Canvas Products, Inc. Western Felt invoiced and shipped to Crown Canvas Products, Inc., 1202% yards of this order under contract QM-7726, on October 15, 1956. From this quantity, numbered lot 7, plaintiff submitted samples to the Philadelphia Quartermaster Depot Laboratory on October 19, 1956. On November 5, 1956, the laboratory submitted a report to plaintiff showing DDDM mildew inhibitor of .45, .50, and .55 percent, or an average of .50 percent, instead of the contract requirement of 1 to 2 percent DDDM mildew inhibitor; and notified plaintiff that lot 7 was rejected.
On November 13, 1956, plaintiff offered defendant a price reduction of one-half cent per unit on lot 7, and on November 15, 1956, defendant accepted the deviations and plaintiff’s offer.
36. Although plaintiff was required by contract QM-7726 to produce and deliver 43,742 units by July 25, 65,447 units by August 24, and 87,550 additional units by September 24, 1956, a total of 196,739 units, plaintiff had delivered only 42,400 units by October 2, 1956. At plaintiff’s request, and in consideration of its agreement to accept as fair and reasonable contract unit prices of .00125 cent, or a total decrease of $384.50, Modification No. 4 of contract QM-7726, dated October 18, 1956, was agreed to by the parties, rescheduling deliveries of the remaining 307,600 canteen covers of the contract total as follows: 82,000 by October 31, 88,000 by November 30, 137,600 by December 31, 1956.
37. Of the total 15,000-yard order referred to in finding 35, Western Felt invoiced, on October 16 and 17, 1956, and shipped to Crown Canvas Products, Inc., 2,663 yards of felt-under contract QM-7726. From this quantity, numbered lot 8, plaintiff, on October 23, 1956, submitted a sample to the *636 Philadelphia Quartermaster Depot Laboratory, which reported to plaintiff DDDM mildew inhibitor of .37, .35, and .35 percent, or an average of .36 percent, as against a contract requirement of 1 to 2 percent DDDM; a splitting resistance lengthwise of an average of 1.7 lbs. and crosswise of an average of 1.4 lbs., as against a contract requirement of 2 lbs. minimum; notifying plaintiff that lot 8 was rejected.
38. Under dates of October 22, 24, and 26, 1956, Western Felt invoiced and shipped a total of 3640% yards of felt as a part of the prior order of 15,000 yards (finding 35) under contract QM-7726. From this quantity, numbered lot 9, plaintiff submitted samples on November 2, 1956, to the Philadelphia Quartermaster Depot Laboratory. The laboratory submitted a report to plaintiff on November 26,1956, showing DDDM mildew inhibitor of .45, .45, and .52 percent, or an average of .47 percent, instead of the contract requirement of 1 to 2 percent DDDM; and thickness in inches of .215, .218, and .225, or an average of .219, instead of the contract maximum of .211 inches, notifying plaintiff that lot 9 was rejected.
Under date of November 30,1956, plaintiff offered defendant a price reduction of one-half cent per unit on lot 9, and on January 9, 1957, defendant accepted the deviations and plaintiff’s offer.
39. Of the prior 15,000-yard order, Western Felt invoiced and shipped to Crown Canvas Products, Inc., an additional 1955% yards of felt under contract QM-7726 on October 31,1956. After receipt from plaintiff, on November 8, 1956, of samples from this quantity, numbered lot 10, the Philadelphia Quartermaster Depot Laboratory, on November 23, 1956, reported to plaintiff mildew inhibitor of .26, .34, and .34 percent, or an average of .31 percent, instead of the contract requirement of % to 1 percent salicylanilide; and notified plaintiff that lot 10 was rejected. Laboratory report 11901, on lot 10, also showed as unsatisfactory an average weight per square yard of 1.73 lbs. over the contract maximum of 1.71 lbs., and an average thickness of .212 inches over the contract maximum of .211 inches.
In the telegram of November 30, 1956 (finding 38) offering a one-half cent unit price reduction on lot 9 plaintiff *637 also offered defendant a one-'half cent unit price reduction on lot 10.
40. On November 1, 1956, Western Felt invoiced and shipped to Crown Canvas Products, Inc., an additional 1657*4 °f Iff© 15,000 yard order previously mentioned (finding 35) under contract QM-7726. Following receipt, on November 16, 1956, of samples of the 1657% yards, numbered lot 11, the Philadelphia Quartermaster Depot Laboratory submitted a report to plaintiff, on December 3, 1956, showing DDDM mildew inhibitor of .48, .43, and .58 percent, or an average of .50 percent, instead of the contract requirement of 1 to 2 percent DDDM; and a weight per square yard of 1.45,1.40, and 1.39 lbs., or an average of 1.41 lbs., instead of the contract minimum of 1.47 pounds; and notified plaintiff that lot 11 was rejected.
41. Lots 8, 9, and 10 having shown the same pattern of substantial deviations, plaintiff’s offers on lots 9 and 10 were neither accepted nor rejected. Response of the defendant was postponed until after receipt of an offer by plaintiff on lot 11, which also followed the pattern of substantial deviations of the preceding lots. Plaintiff’s offer of one-half cent per unit reduction on lot 11 was sent to defendant on December 13,1956. The contracting officer accepted the deviations and offers on lots 9, 10, and 11 on January 9, 1957.
42. On November 6, 21, and 28, 1956, Western Felt invoiced to Crown Canvas Products, Inc., under contract QM-7726, a total of 3635% yards of felt of the earlier order of 15,000 yards mentioned in previous findings, leaving a balance of 246% yards of the original order not yet received. On receipt from Western Felt by Crown Canvas Products, Inc., of an additional 279% yards, plaintiff submitted, on December 31, 1956, samples of this last and accumulated lot 3,915 yards. After receipt on January 3,1957, of samples from this last lot, numbered 12, the Philadelphia Quartermaster Depot Laboratory made a report to plaintiff on January 16,1957, showing DDDM mildew inhibitor of 2.18, 2.00, and 2.60 percent, or an average of 2.26 percent, which was above the contract requirement of a maximum of 1 to 2 percent DDDM; and moisture resistance of 43.8, 34.4, and 103.7 percent, or an average increase in weight of 60.6 per *638 cent, compared to the contract requirement of a maximum of 50 percent increase in weight. This felt, lot 12, totaling 3,915 yards, was accepted by defendant without any reduction in price.
43. By December 31, 1956, plaintiff had delivered only 70,800 units. Accordingly, at plaintiff’s request and in consideration of its agreement to accept a further decrease, as fair and reasonable, of the contract unit price of $.00375, or a total further decrease of $888, Modification No. 12, dated March 1, 1957, of contract QM-7726 was negotiated by the parties, rescheduling the then remaining 236,800 canteen covers as follows: 60,400 by January 31, 80,000 by February 28, and 96,400 by March 31, 1957.
44. By May 7,1957, plaintiff was in default on delivery of 108,900 units, and on that date defendant, by wire and formal Modification No. 13, terminated contract QM-7726 in part for default in delivery of the quantity in excess of 284,500 units, i.e., the difference between the original contract quantity of 350,000 and 284,500, or 65,500 units. By this partial termination and modification, the contracting officer, in effect, reduced plaintiff’s obligation under the contract for delivering a total of 350,000 units to a total of 284,500 units. Accordingly, as of May 7, 1957, plaintiff was obligated to deliver only 43,400 additional canteen covers to complete the modified contract.
45. Between May 7 and May 27, 1957, plaintiff delivered only 10,500 units of the required final quantity of 43,400 units. On May 27, 1957, plaintiff notified defendant that it was unable to complete the contract as modified. By letter dated June 5, 1957, from the Successor Contracting Officer to plaintiff, defendant terminated contract QM-7726 for default as follows:
Reference is made to Contract No. DA-36-030-QM-7726 OI-2391-E-56 dated 26 April 1956 and to Article 11 entitled “Default” of Standard Form 32 “General Provisions (Supply Contract)” of subject contract.
This letter confirms the telegram from this office dated 29 May 1957 in which you were advised that your right to proceed further with performance under subject contract was terminated in default.
The undersigned Successor Contracting Officer hereby makes the following findings of facts:
*639 1. Under subject contract you were required to manufacture and deliver on an FOB Origin basis 350,000 Cover, Canteen, Dismounted, M-1910 at a unit price of $.585 each for a total contract price of $204,750.00. 43,742 were to be delivered by 25 July 1956; an additional 65,447 by 24 August 1956; an additional 87,550 by 24 September 1956; an additional 87,550 by 25 October 1956; and an additional 65,711 by 24 November 1956.
2. The canteen covers were to be manufactured in accordance with Military Specification C-1725A dated 19 March 1953, with stated exceptions.
3. By Modification No. 4, Supplemental Agreement No. 1 dated 12 October 1956, the contractor was granted an extension in the delivery schedule in consideration of a decrease in the contract price of $384.50 on the undelivered quantity of 307,600 units. 82,000 were to be delivered by 31 October 1956; an additional 88,000 by 30 November 1956 and an additional 137,600 by 31 December 1956.
4. By Modification No. 12, Supplemental Agreement No. 2 dated 11 February 1957, the contractor was granted a further extension in the delivery schedule in consideration of a decrease in the contract price of $888.00 on the undelivered quantity of 236,800 units. 60.400 were to be delivered by 31 January 1957; an additional 80,000 by 28 February 1957; and an additional 96.400 by 31 March 1957.
5. You were notified by telegram dated 7 May 1957 and confirmed by letter dated 7 May 1957, that your right to proceed further with performance under subject contract was terminated in part for default for that quantity which exceeded 284,500 ea. Covers, Canteen.
6. As of 14 May 1957, you delivered a total of 251,600 units.
7. On 27 May 1957 you advised the undersigned Successor Contracting Officer that you were unable to complete performance under subject contract and accordingly would not perform any further under the contract.
8. Your default is not excusable within the terms of the contract.
The Government reserves the right to procure in the open market the supplies required under subject contract and to hold you liable for any excess costs incurred thereby, including costs incurred as a result of inspection, transportation, repurchase, etc. In addition, thereto, the Government reserves the rights and remedies provided by law or under the contract.
*640 If the decision hereinbefore set forth results in a dispute concerning a question of fact or a dispute otherwise made subject to the Disputes procedures by specific contract provisions, you are hereby notified that you may appeal from this decision to the Secretary of the Army in accordance with the provisions of Clause 48, “Disputes” of the above numbered contract. A notice of appeal must be in writing and should indicate that an appeal is thereby intended, and should identify the contract (by number) and the decision from which the appeal is taken. The original, together with two copies, should be filed with the undersigned Contracting Officer. If a Notice of Appeal is filed, it will be forwarded to the Armed Services Board of Contract Appeals and the Becorder of that Board will docket the appeal and will forward to you a copy of the Buies of the Board. Under the Buies, the original and three copies of a complaint may be filed with the Contracting Officer at the time the Notice of Appeal is filed, or it may be filed with the Becorder of the Board after the Appeal has been docketed. The rules provide that a complaint should set forth a simple, concise, and direct statement of each claim and show wherein a Contractor contends that he is entitled to relief.
The rules further provide that each claim shall be stated with as much particularity as is practical, that each claim should be separately identified, that documentary evidence in support of claims may be filed as exhibits to the complaint, that all documents filed as exhibits to the complaint shall be plainly listed and identified in the complaint, and that an original and three copies of the complaint shall be filed.
46. On June 20,1957, plaintiff filed with defendant a written “Notice of Appeal” from the findings of fact contained in defendant’s letters of May 7 and June 5, 1957, quoted, in part, as follows:
* * * Specifically, Crown Coat Front Co., Inc. appeals from the following findings of fact:

Letter dated May 7,1957 (Mod. #13)

Par. 6. Your failure to deliver in accordance with the schedule of deliveries, is attributable to the following:
a. Lack of employment of a sufficient number of qualified and trained personnel.
b. Lack of effective management for the purpose of accomplishing performance under this contract.
*641 c. Difficulties encountered by you in meeting specification requirements.
Par. 7. Your default is not excusable within the terms of the contract.

Letter dated Jwne 5,1957 {Mod. #15)

Par. 7. On 27 May 1957 you advised the undersigned Successor Contracting Officer that you were unable to complete performance under subject contract and accordingly would not perform any further under the contract.
Par. 8. Your default is not excusable within the terms of the contract.
With particular reference to the findings of fact set forth in Paras. 6 a, b, c of letter dated May 7, 1957, Crown Coat Front Co., Inc. makes the following allegations.
a. The factory of Crown Coat Front Co., Inc. was located in the City of New York which is a Labor Surplus Area and had at its disposal at all times as many qualified and trained personnel as was required to complete the contract.
b. It had as Foremen in charge of Production, men, who had at least 20 years of experience in working with Canvas Products and were qualified to supervise the production of Canteen Covers which is a comparatively simple item. In addition, the principals of Crown Coat Front Co., Inc. have been in the canvas business in excess of 20 years.
c. Crown Coat Front Co., Inc. encountered no difficulties in meeting the Specification of the End Item. The records will disclose that shipments were made with a minimum of rejections. Failure of the Felt and the Thread to meet the Specifications was beyond the control and without the fault and negligence of Crown Coat Front Co., Inc. In fact, Crown Coat Front Co., Inc. paid its suppliers of Felt and Thread prices over and above the market price in order to insure they would get Specification Material and in each case obtained an agreement with its suppliers that it would furnish Specification components.
It is the contention of the Crown Coat Front Co. Inc. that its failure to deliver in accordance with the schedule of deliveries was due to causes beyond its control and without its fault or negligence including acts of the Government and its Subcontractors. More comprehensive allegations concerning the causes of delay will be *642 set forth in a Complaint which will be filed after the appeal is docketed.
47. On August 12, 1957, plaintiff filed with the Armed Services Board of Contract Appeals “Appeal of Crown Coat Front Co. Inc.” as follows:
In support of its appeal from the Findings of Fact of the Contracting Officer dated May 7,1957 and June 5, 1957, Crown Coat Front Co. Inc. makes the following Complaint:
1. On April 26, 1956 it was awarded Contract No. DA-36-030-QM-7726 which provided for furnishing and delivering 350,000 Covers, Canteen, Dismounted at $.585 each, total price $204,750.00, deliveries to be made as follows:
43,742 by July 25, 1956
65,447 by Aug. 24, 1956
87,550 by Sept. 24, 1956
87,550 by Oct. 25, 1956
65,711 by Nov. 24,1956
These deliveries were later extended in consideration of a reduction in price, the latest extension providing for final delivery to be made in March. 1957.
2. Upon receiving the award Crown immediatelv ordered felt which was a basic material to be furnished by the contractor. This material was ordered from Western Felt Works Co. and in placing the order it was specified by Crown that the felt should strictly conform to the Government specifications. In order to be assured that the specifications would be met Crown obtained a certification from Western to that effect and also paid top price for the felt.
3. After the felt was delivered to Crown samples were sent to the Government laboratory for testing. The Government then alleged that the samples did not meet the specifications in certain respects. Crown immediately notified Western, its supplier, who stated that the supplies did meet the specifications. Crown also requested that the Contracting Officer accept the felt at a reduction in price. As a result it was necessary for Crown to stop production until the matter was resolved. After the lapse of a long period of time which was completely unreasonable, the Contracting Officer finally accepted the felt. The same thing happened with respect to every sample of felt submitted thereafter. Every sample was reported to have failed and the Con *643 tracting Officer went through the same procedure each time consuming from four to twelve weeks before accepting the felt. During all these periods production was curtailed and in many instances completely stopped.
4. Due to the unreasonable length of time taken by the Contracting Officer to approve the acceptance of felt Crown did not meet the scheduled deliveries and was terminated.
5. The termination notice contained findings of fact alleging that the delay was due to various factors within the control of Crown and was not excusable. These allegations have been answered in the Notice of Appeal previously filed.
6. It is the contention of Crown Coat Front Co. Inc. that if the Government had notified it of the acceptance of the felt within a reasonable time it would have met the scheduled deliveries, that the delay was due to causes beyond its control, without its fault or negligence and in nowise contributed to by it.
48. On February 19 and 21,1958, hearings were had before the Armed Services Board of Contract Appeals, at which plaintiff was represented by counsel and its secretary, Sam Weiner, who testified. Plaintiff was unable to obtain the appearance of a representative of Western Felt Works on a voluntary basis, and, since the Board was not empowered to subpoena witness, no testimony was presented from that source. The hearings were adjourned for the purpose of allowing an opportunity for plaintiff to obtain proof from its supplier of felt, Western Felt Works, of Chicago, Illinois.
49. Plaintiff filed its petition in this Court on May 17, 1958, demanding judgment for $75,000, based upon an alleged breach of contract by defendant in rejecting as unacceptable under the applicable specifications various lots of felt which had been submitted by plaintiff.
50. On August 21,1958, the Armed Services Board of Contract Appeals filed its decision and opinion as follows:

Opinion by Colonel MacLeod

This is an appeal from the termination of the above contract for failure to deliver in accordance with the contract requirements. Appellant contends that the failure is due to delay on the part of the Government and is therefore excusable.
The contract, in the form of Invitation and Bid, and Award, was issued as of 26 April 1956 by the Philadel- *644 pbia Quartermaster Depot for the supply of 350,000 canteen covers at a unit price of $.585 and total price of $204,750. The covers were to be made of canvas with a felt lining. Delivery, as finally extended by the contracting officer, was to be made in specified monthly installments, and completed by 31 March 1957. There were included in the contract terms General Provisions No. 5, “Inspection”; 11, “Default” and 48, “Disputes”. The case is before us as the duly authorized representative of the Secretary of the Army under the latter provision.
Additional General Provision 28, “Government Laboratory Testing of Samples” provides that production shall not be delayed pending receipt of reports of laboratory tests or inspection performed by the Government, adding a caution that at least 12 days are required by the laboratory from the date of receipt of the sample to the date of mailing the report.
Deliveries were never made in accordance with the contract schedule, and the original completion date of 31 October 1956 was twice extended before the contract was finally terminated. An inspector’s report of 3 May 1957 indicates that there were 108,900 units past due and not shipped as of that date. Practically no work at all was being done at the plant. On 7 May 1957 the contracting officer terminated appellant’s right to proceed with respect to the excess over 284,500 covers, leaving open the opportunity to complete work on those which had already been cut. No further work was done, and on 29 May 1957 the right to proceed at all was terminated for default after the contracting officer was requested by appellant’s representative to remove the Government-furnished material as appellant was being evicted from the premises and no longer had machines to perform the contract. Appellant took a timely appeal from this termination on 20 June 1957.
Appellant contends that the failure to perform was due, not to its own fault or negligence, but to delays on the part of the Government in testing and negotiating the acceptance of the felt component of the covers after it had been found to deviate from the specifications.
At the hearing before the Board appellant also took the position that the felt did meet the specifications, notwithstanding the fact that Government tests of at least nine lots found failures with respect to moisture and mildew resistance. Permission was given to produce testimony of the supplier with respect to these qualities, *645 but appellant lias notified the Board that it was unable to obtain such testimony. In view of that fact, and of appellant’s action in offering, in each instance, to accept a reduced price for the felt without disputing the Government findings, we must find that the felt did not comply with the specifications.
The delays sought to be charged to the Government are primarily in negotiation and acceptance of reduced prices for canteen covers made with felt lining which had been found to deviate from the specifications, although it also claimed that, in some instances, an unreasonable time was taken in testing the material and advising appellant of the results of the tests. While appellant was required by the contract to proceed with performance pending the completion of the tests, it could not use the material after it had been found to deviate from the specifications until the parties had negotiated terms upon which the Government would agree to permit its use. Pending such agreement, production in appellant’s plant was delayed because very few operations in the manufacture of the canteen covers could be performed without the use of the felt. The cumulative effect of these delays, as testified to by appellant’s representative, was such that appellant’s credit position deteriorated to the point where it was no longer able to operate. The proceeds of the contract had been assigned to obtain money for performance, and this loan could be paid only out of the proceeds of material delivered. When no deliveries were made, the loans were not paid, and appellant’s credit was soon exhausted.
The time taken for each step from the submission of samples of felt for testing until final Government acceptance is as follows:

From 14 to 24 days were required for the test and report to appellant of the result. Appellant seems to place the limit of reasonableness at about 15 days. The contract states that at least 12 days must be allowed for *646 the laboratory test, leaving 3 days or less for report of the test results through the contracting officer to appellant.
After receipt of the reports of the laboratory tests, appellant took from 1 to 18 days to make an offer to the Government of a reduced price for covers made with nonspecification felt. The Government took from 1 to 27 days to accept these offers, except that it took 40 days in the case of lots 9 and 10, which were handled as one transaction. The reason for this delay is that the Quartermaster Research and Engineering laboratory at Natick, Massachusetts requested further tests on these lots, which were performed in Philadelphia, and which took 14 to 20 days of the time.
After the contractor had been notified of a rejection on the basis of a laboratory report, it was the practice of the Government to allow a few days for it to determine whether to request acceptance of the deviation or a re-test, or to submit new material. Upon receipt of a request for acceptance of the deviation, the contracting officer sought technical advice from interested Quartermaster offices, and in this case referred the request also to the Research and Engineering laboratory at Natick, Massachusetts. In the case of lots 9 and 10, that laboratory requested additional tests which took from 14 to 20 days. The necessary clearances were apparently recommended by a Deviation Board, consisting of various military and civilian officials of the Philadelphia Quartermaster Depot. In some instances clearance was obtained in advance of appellant’s request on the basis of similar action with respect to previous lots. In others a more detailed examination was required. It has not been alleged or proven that the contracting officer’s actions were not justified in any instance.

Decision

The sole question before us is whether appellant’s failure to perform was beyond its control and without its fault or negligence.
We cannot find that the time taken by the Government (1) to make the tests and advise appellant of the results, and (2) to consider and accept appellant’s offers of the nonspecification felt at a reduced price, was in any instance unreasonable. The contract gives notice that at least 12 days are required for the laboratory tests. The time taken in excess of 12 days for the first step compares favorably with the time taken by appellant *647 to make an offer after receipt of advice of the test results. The Government took somewhat longer to consider the offers when received, but there is no evidence the consideration given to the offers was in any instance unnecessary or unreasonable.
It is not contended that felt meeting the specifications could not have been obtained from other sources, or that it was impossible to comply with the specifications. It does not appear that the felt supplied could not have been reworked or retreated to make it suitable. It is well established that appellant is bound by the terms of the contract as written and the Government is under no obligation to accept nonspecification supplies. Albert Furniture Company, ASBCA No. 3644, etc., 58-1 BCA par. 1622; Slingerland Drum Company, ASBCA No. 2131, 6 CCF par. 61,758.
Appellant’s only action upon being notified of the failure of successive lots to meet the requirements of the laboratory tests was to offer a price reduction for acceptance of the contract item with the nonspecification felt. While appellant’s initial reliance on its supplier may have been fully justified, the continued acceptance from that supplier and submission to the Government of nonspeciiication felt was inexcusable. This practice should have discontinued long before its submission of lots 9 and 10 which involved the delay of 40 days. It is likewise not without significance that the five months’ extension obtained by appellant exceeds the time consumed by the Government in considering the accepting appellant’s nine successive offers of nonspecification material.
We find that the failure to perform was directly attributable to appellant’s continued submission of non-specification material and that its default was not beyond its control and without its fault or negligence.
The appeal is denied.
51. The tests for evaluating the mildew inhibitors, i.e., whether there was 1 to 2 percent DDDM and y2 to 1 percent salicylanilide contained in the felt, were not described in MIL-M-2312. The contract provided that tests of the felt to ascertain whether such felt conformed to the indicated specifications were mandatory, and if the felt did not meet the specifications the defendant had the options of rejection, correction, or acceptance at a reduction in price. Government laboratory testing of samples of the felt was specifically indicated by the contract, which also provided *648 that inspection of the end-product was not to be delayed pending reports of testing in a Government laboratory.
52. During the period covered by the contract, 1956 to 1957, the applicable methods for testing DDDM content of plaintiff’s felt were specified in Federal Specification Textile Test Methods, CCC-T-191b. Method 2011 and, if the sample failed, Method 2012, were applied by defendant to each sample of felt submitted by plaintiff to the Philadelphia Quartermaster Depot Laboratory under contract QM-7726, and the reports to plaintiff showing DDDM mildew inhibitor content in the samples reflected results of such Government laboratory tests. The applicable tests for felt used by plaintiff were the tests provided by contract specifications, i.e., MIL-M-2312, dated July 17, 1950.
53. Neither Western Felt nor plaintiff reported the specific content of DDDM or of salicylanilide mildew inhibitor in the samples, but Western Felt furnished a certificate with each shipment to plaintiff that the felt was treated for mildew resistance in accordance with the requirements of Specification MIL-M-2312. There was no contract provision requiring the test for DDDM or salicylanilide content under Specification MIL-M-2312. Defendant tested each sample for salicylanilide content after testing for DDDM content.
54. Western Felt construed the contract QM-7726 as not specifically requiring it, as plaintiff’s supplier, to test its felt before shipment for the specified quantity of mildew inhibitor. It was required to give the felt both mildew and moisture-resistant treatment to meet the requirements specified. The type and amount of inhibitor used were considered to be sufficient by the supplier based upon prior experience of the firm. Accordingly, actual tests to determine whether the treatment given the felt was sufficient were not made by the supplier before shipment to plaintiff.
55. Following defendant’s rejections of felt under contract QM-7726, plaintiff did not avail itself of the contractor’s privilege to have the rejected felt returned and corrected by increased treatment of DDDM or salicylanilide, and to have all the felt tested for mildew inhibitor prior to shipment. Plaintiff’s explanation of its refusal to take these steps in *649 tbe face of contixmous rejections was the expense of doing so. Western Felt was apparently unwilling to bear sucli expense, although it furnished a certificate with each shipment to the plaintiff stating that the felt met the requirements of the specifications. When a rejection notice was received from the defendant’s laboratory it was brought to the attention of Western Felt. Western Felt insisted it would not happen again. It did happen several times thereafter, making it necessary for plaintiff to reduce the price before defendant would accept the felt.
56. Upon the rejection of the initial lot of felt, plaintiff got in touch with another supplier of felt, named Felters, in July 1956. That firm offered plaintiff felt at 5 cents a yard less than Western Felt’s price. Because of Western Felt’s oral promises that it would not again supply plaintiff with unacceptable felt, plaintiff did not make a change in its supplier.
57. Lots 1, 2 and 4 having been rejected for a deficiency in mildew inhibitor, when lot 5 was rejected for the same deficiency plaintiff, in October or November 1956, again demanded an explanation from Western Felt, and was told by Western Felt’s chemist that Western Felt’s water shrinkage test before shipment may have washed out some of the mildew inhibitor from the felt, and that, since the felt was then finished and ready for shipment, it could not be treated with additional mildew inhibitor chemical to make up the deficiency. Western Felt further represented to plaintiff that it would treat future felt with greater quantities of mildew inhibitor chemical and wait and see if the required quantities held through the water shrinkage test and the final Government tests for mildew inhibitor.
58. Although lots 7, 8, 9,10,11, and 12, in succession, were rejected on account of mildew inhibitor failure on the Government tests, plaintiff continued its orders for Western Felt’s felt without cancellation and did not again raise with Western Felt the question of the unsatisfactory effect of its water shrinkage test upon the required quantity of mildew inhibitor with which Western Felt claimed it treated its felt before shipping it to plaintiff. It is plaintiff’s contention that all the lots of felt except No. 1 met the requirements of MIL-M-2312 as to mildew resistance.
*650 59. Contract QM-7726 required the contractor to insert therein the name and location of the plant at which the contract would be performed and the name and location of the contractor’s shipping point. In both instances the plaintiff named itself, Crown Coat Front Co., Inc., and 105 East 16th Street, New York City. But on and after June 1, 1956, the name of the plaintiff and shipping point was Crown Canvas Products, Inc., and the location of the plant was 30-82 West 13th Street, New York City. By Modification No. 1 of contract QM-7726, dated June 27,1956, on request of the plaintiff, the location of the plant, inspection point, and shipping point was changed from 105 East 16th Street to 30-32 West 13th Street, New York City. Under date of October 16, 1956, defendant wrote plaintiff inquiring concerning reports reaching defendant that both contracts QM-7726 and QM-7796 had been assigned or subcontracted to Crown Canvas Products, Inc.
Under date of October 16, 1956, plaintiff replied stating the contracts had been assigned to the Amalgamated Bank of New York and that, by Modification No. 1, the plant location had been changed, but said nothing of the change of the name or location of the plant, and made no reference to a subcontract with Crown Canvas Products, Inc. Plaintiff’s delay in advising defendant of its subcontract with Crown Canvas Products, Inc., for the manufacture of the canteen covers, and the fact that Crown Canvas Products, Inc., was doing all the manufacturing and paying all of the overhead, including labor and rent, constituted a withholding of information to which defendant was entitled. Four months later defendant learned of such a contract, and requested plaintiff to communicate with defendant about the matter immediately, citing Article 36 of the contract in full. Plaintiff replied, but still made no reference to a subcontract with Crown Canvas Products, Inc., and reiterated that the contracts in question (QM-7726 and QM-7796) were “assigned to the Amalgamated Bank of New York.” It was only after defendant had again pressed plaintiff for a direct answer that plaintiff, on February 26, 1957, admitted a subcontract had been negotiated and that Crown Canvas Products, Inc., had been performing the whole operation of plaintiff’s con *651 tracts with defendant. A copy of the agreement with Crown Canvas Products, Inc., is a part of plaintiff’s proof in the case. The contracting officer approved the plant located at 30-32 West 13th Street, and the contract was performed at that location.
60. The taking of proof before the Armed Services Board of Contract Appeals, upon plaintiffs’ appeal from the contracting officer’s findings and termination for default of contract Q.M-TY26, was closed, at plaintiff’s request, because plaintiff was unable to obtain a voluntary appearance by Western Felt Works before the Board and the Board was not authorized to issue subpoenas for such appearance and testimony. The testimony offered on behalf of Western Felt Works during the trial of this action was to the effect that such felt had been treated with sufficient mildew inhibitor on a dry basis, prior to shipment to Crown Canvas Products, Inc., or the receipt of samples thereof by defendant’s laboratory, to meet the requirements of the specification that the treated felt must show no visible sign of mildew after being exposed to the mildew infection test contained in paragraph F-4 of MIL-M-2312.
61. The decision of the Armed Services Board of Contract Appeals related to the subject of a proper basis for termination of the contract, i.e., whether such termination should have been made under the default provision of the contract or the termination-for-convenience article of the contract. The Board found that the contract was terminated for default because of plaintiff’s failure to perform the contract. It was further found that the failure to perform was not beyond the control or without fault or negligence on the part of plaintiff. The Board also found that the plaintiff’s failure to perform the contract in the time originally allowed, plus the extension of 5 additional months allowed by defendant, “was directly attributable to appellant’s continued submission of nonspecification material.”
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the case is re *652 manded to the trial commissioner for further proceedings relating to the right of defendant to recover on its two counterclaims.