## FISHER v. UNITED STATES.
### No. 44590.

Court of Claims.
Oct. 6, 1941.

R. M. O'Hara, of Detroit, Mich. (Benjamin E. Jaffe, of Detroit, Mich., on the brief), for plaintiff.

D. F. Hickey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, Sp. Assts. to Atty. Gen., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

The plaintiff sues to recover income taxes alleged to have been erroneously collected because the Commissioner of Internal Revenue refused to allow a deduction of alleged bad debts of $143,127.06. The defendant says the deduction is not allowable because (1) the amount claimed was not a debt; (2) because it was not ascertained to be worthless; and (3) because it was not charged off within the year.

The facts surrounding the creation of the alleged debts, briefly stated, are as follows: On October 5, 1925, W. P. Wink, plaintiff's father-in-law, opened an account for himself with Paine, Webber & Company, stock brokers, and also opened an account for his son, W. J. Wink. At the time he deposited for himself with these brokers $45,000, and he deposited with them $12,500 for his son, W. J. Wink. The understanding was that the accounts of both W. P. Wink and W. J. Wink were to be handled exclusively by the plaintiff, but for the benefit of W. P. Wink and W. J. Wink, respectively.

As a result of trading in these accounts, W. P. Wink had an equity with these brokers on November 28, 1928, of about $170,000, and W. J. Wink had an equity of about $50,000. On this date plaintiff was carrying with them two accounts for himself, three accounts, as agent for others, and six accounts for parties named, including the two Winks. He then wrote his brokers authorizing them to apply any margin in any of the accounts against any future deficit in the others, if the deficit was not paid on demand. A year later, after the stock market crash, he personally guaranteed any deficit then in the two Wink accounts or that might thereafter arise.

On December 31, 1931, all of the securities in the account of W. P. Wink had been sold, and there was a deficit of $95,-501.78, and there was a deficit in W. J. Wink's account of $47,625.28 after all the securities had been sold. On this date these deficits were paid by the plaintiff. It is the total of the two, $143,127.06, that the plaintiff seeks to deduct as a bad debt.

■ There is no direct testimony to show whether these guaranties and the subsequent payments were purely voluntary on plaintiff's part, or were done at the request of the two Winks. Plaintiff took the stand but was silent on the subject. Neither of the Winks testified, and there is no explanation of why they did not. Had there been promises to repay or requests that he guarantee the accounts, from which an implied promise would arise, it easily could have been proven. Plaintiff's silence on the subject and his failure to put the Winks on the stand is a strong indication there was no such promise, express or implied. If plaintiff was a pure volunteer, of course the Winks did not become indebted to him.

■ Plaintiff traded in the accounts as his own, even to the point of authorizing the brokers to apply the margin in any one of the eleven accounts he was handling for himself and others to the deficit in any of the other accounts. So far as is shown, he did not consult the Winks or anyone else about anything he did with respect to them, including the giving of the guaranties. The most that appears is that the Winks had knowledge of the fact that plaintiff had guaranteed them. From this alone can there be implied a promise to repay whatever he might lose as a result of the guaranty? We think not. Other circumstances negative such an implication, the fact that no testimony was offered to show an express promise or a request for the guaranties, the relationship of the parties, the fact that plaintiff had the exclusive management of the accounts and that there had been large equities in each, and that these had been lost under plaintiff's management, that plaintiff was a wealthy man and the Winks people of quite moderate means. For aught that appears, plaintiff may have thought he had held on too long and had lost for his father-in-law and brother-in-law the margins that had been built up, when he should not have done so, and so was willing to take a chance on his own account of further losses—which he could afford and they could not—in order to try to recoup some of the decline. Whether this is so, we do not know. We do not know what the understanding was, if any. It was within plaintiff's power to disclose the whole transaction, but he did not do so. From this there arises a presumption that the facts, if disclosed, would be more harmful to him than helpful. We must hold accordingly that there arose no indebtedness from the Winks to plaintiff on account of the payment by him of the deficits.

This makes it unnecessary to consider the defendant's other defenses. Plaintiff's petition must be dismissed. It is so ordered.