By the Review Panel :
Senate Resolution 19, 91st Cong., 2nd Sess., of October 14, 1970, referred S. 263, 91st Cong., 1st Sess., to the Chief Commissioner of the United States Court of Claims for proceedings and report pursuant to 28 U.S.C. §§ 1492 and 2509 (1970). S. 263 would authorize the payment of $24,890.52 to the claimant, the H & H Manufacturing Company, on account of losses suffered by the company under a contract of June 24,1955.
The Chief Commissioner referred the case to Trial Commissioner William E. Day for proceedings in accordance with the rules, and designated the above named members of the Review Panel to consider the trial commissioner’s conclusions on the merits of the legal and equitable claims.
After trial on the merits, Commissioner Day on April 3, 1972, filed an opinion and detailed findings of fact. He concluded that the claim has neither legal nor equitable merit and that any payment thereon would be a gratuity. The case is before the Review Panel on claimant’s exceptions to the *801 trial commissioner’s opinion, findings of fact and conclusion. The matter bas been fully briefed; the claimant has filed an opening brief accompanying its exceptions and a brief in reply to the Government’s answering brief. Oral argument by the parties has been heard.
In accordance with Senate Resolution 19, supra, the Review Panel informs the Senate:
The contract of June 24, 1955 between the Frankford Arsenal and the claimant provided for the manufacture of a number of cartridge-actuated devices, called thrusters, employed in the system for the escape of the crew of a jet aircraft. The contract was terminated by the Government for the claimant’s default in failing to plate the interior of the devices delivered, a portion of those contracted for, and the claimant was charged with the excess costs of the Government’s reprocurement. A suit challenging the Government’s action, thereafter brought by claimant against the United States, was resolved against the claimant, in H & H Mfg. Co. v. United States, 168 Ct.Cl. 873 (1964).
The present claim is based upon the alleged inequity that plaintiff should have suffered the termination of its contract and the imposition of excess reprocurement costs for a failure to plate the interior of the devices while, allegedly, the American Optical Company, the reprocurement contractor, was in fact not required to plate the interior of the devices supplied under the reprocurement contract. The proof did not support the claim; it appeared that the American Optical Company in fact plated the interior, and the trial commissioner rejected the claim.
Claimant’s other factual claims — as to the near-difficulty or impossibility of its performing the contract — were also not proven.
In seeking review and reversal of the decision of the trial commissioner, claimant makes a variety of arguments, all of which we have considered and found without merit:
(1) Claim is made that the trial commissioner treated the findings in the earlier case, reported hi 168 Ct.Cl. 873, as binding in this Congressional reference proceeding, contrary to the decision in North Counties Hydro-Electric Co. v. United States, 170 Ct.Cl. 241, 248-49 (1965). But cf. Burk *802 hardt v. United States, 113 Ct.Cl. 115, 82 F. Supp. 333 (1949). Claimant is incorrect in charging that the trial commissioner felt himself bound by the earlier findings. The parties in this proceeding early agreed that the entire record in the earlier case could be considered in this case. The trial commissioner, apparently concluding that the earlier findings were supported by the record, which was before him, incorporated large parts of those findings in his own findings; he omitted some parts and also added to the earlier findings. It seems to us that he was exercising his judgment on the total record, including that from the prior proceeding. Since there is nothing indicating that the commissioner deemed himself foreclosed by the former findings, we do not reach the issue of whether the findings of fact in an entirely legal action against the United States are as a matter of law binding in a subsequent Congressional reference proceeding brought by the former plaintiff.
(2) Individual findings of the trial commissioner (some of them of only connecting or background relevance) are objected to by claimant, on the basis of evidence said to point in a direction contrary to the findings. We have, however, found ample evidence to support these findings.
One such contention is that it was difficult to the point of impossibility to plate the interior of the device. The evidence is that it was done, successfully, in the performance of the repurchase contract. Another contention is that a certain rack used in dipping the devices into the plating solution was not in existence until 1969. The evidence is that a rack for the purpose was in existence at the time, in the nineteen-fifties, when claimant was attempting to perform its contract. A third is that once the interior of the device was not plated, in the devices delivered, stripping the outside plating in order to replate both the inside and outside would have been all but impossible. The evidence is that it could have been and was done elsewhere.
(3) It is claimed that since the Government failed to call the subcontractor of the American Optical Company who did the plating in the repurchase contract, it should be presumed that the evidence of that subcontractor would be adverse to the position of the Government. This contention *803 is without merit. The Government had no obligation to call a particular subcontractor and in fact did call a witness from the American Optical Company who bad sufficient knowledge.
(4) Lastly, it is claimed that the repurchase contract was let in order to provide educating work for a new plant of the American Optical Company, and without regard to the Government’s interests. The claim is not supported by the facts.
The trial commissioner’s findings of fact, opinion and conclusions, the detailed briefs of the parties and the entire record have been carefully considered by the He view Panel. We unanimously agree with the trial commissioner’s findings, opinion and conclusion as hereinafter set forth and therefore adopt the same, with the foregoing remarks, as the basis for our recommendation that the claimant has neither a legal nor an equitable claim against the United States, and that any payment on its claim would be a gratuity.
The trial commissioner’s opinion, findings of fact and conclusions, as adopted by the Eeview Panel, follow:
OPINION OP THE TRIAL COMMISSIONER
Day, Commissioner:
On October 14, 1970, the Senate referred S. 263, 91st Cong., 1st Sess. to the Chief Commissioner of the United States Court of Claims for proceedings in accordance with the provisions of 28 U.S.C. §§ 1492 and 2509 (1970). The legislative proposal in question is entitled “A BILL For the relief of the H. and H. Manufacturing Company, Incorporated.” It proposed that the Secretary of the Treasury be authorized and directed :to pay H & H Manufacturing Company, Incorporated of Clifton Heights, Pennsylvania:
* * * the sum of $24,890.52, in full satisfaction of all claims of such company against the United States for reimbursement for losses incurred under contract numbered DA-36-038-OB.D-19235, dated June 24, 1955, entered into by the United States with such company, such losses having occurred as the result of an ambiguity in the contract which led to an erroneous interpretation by such company of certain specifications required by the United States in such contract * * *.
*804 The reference of S. 263 to the Chief Commissioner was accomplished by means of S. Ees. 19, 91st Cong., 2d Sess. Said resolution directed that Congress be forwarded:
* * * such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due from the United States to the claimant.
The petition of PI & H Manufacturing Company, Incorporated (hereinafter “H & H”) was filed with the clerk of the court on October 26, 1970, and the answer of the United States was filed on December 28, 1970. The case was tried on the merits in Philadelphia, Pennsylvania on August 17, 1971, and the filing of post trial briefs and requested findings of fact was completed by February 29,1972.
The essential facts surrounding plaintiff’s claim are summarized here. Detailed and separately stated findings of fact are to be found at the conclusion of this opinion.
On May 6, 1955, Frankford Arsenal, Department of the Army, Philadelphia, Pennsylvania, issued an invitation to bid for the manufacture of 1,031 M3A1 thrusters. A thruster is a cartridge-actuated device employed in the crew escape system of jet aircraft. On or about June 24, 1955, contract DA-36-038-OKD-19235 was entered into between plaintiff (low bidder) and the United States Army Ordnance Corps.
The production of an M3A1 thruster unit required the manufacture of a number of components, including a major item called a “breech.” The interior of a breech compares roughly with the bore of a rifle. The firing pin is assembled into it and must travel down the bore to detonate the cartridge contained at the end of the breech. The chemicals used to prepare the breeches for plating render any .unplated surfaces particularly subject to corrosion, a condition which is exacerbated by the temperature differentials and moisture encountered by aircraft operating at various altitudes. Failure of the firing pin to detonate the cartridge in the thruster due to corrosion surrounding the pin, spring, and block assembly has been found to have been the cause of one fatal accident involving Naval aircraft.
*805 By the end of March 1956, plaintiff had delivered a total of 483 thrusters, all of which had been accepted and paid for by defendant. There remained some 548 such thrusters still to be delivered. Shortly thereafter, in the course of examining a breech component, the Government’s inspector arrived at the conclusion that the interior opening within the breech had not been plated. He communicated this suspicion to Arsenal personnel, who then cut open one of the previously manufactured breeches. It was found that it had not been plated. During previous inspections it had been assumed by the inspector that the small interior opening within the breeches had been plated, as plaintiff had furnished certificates from its subcontractor to the effect that the breeches had been plated in conformance with specifications.
Plaintiff agreed that the interiors of the breeches had not been plated, but contended that such plating was not required either by the contract drawing or by the specifications. The court resolved this dispute in its opinion in H & H Mfg. Co. v. United States, 168 Ct. Cl. 873 (1964) ,[1] concluding at p. 879, that “plating of the breech interior was a contractual requirement * *
In apparent disregard of the requirements of the “Disputes” clause of its contract, plaintiff declined to proceed with the production of the remaining 548 thrusters. At the trial of its case cited above, plaintiff contended that it was financially unable to proceed with work under the contract. By that time it had expended over $40,000 in performing a $20,000 contract, and its certified public accountant had advised management that if the loss to complete the contract was as great ias the loss to date, insolvency or bankruptcy would result. Losses resulted from flood damage to plaintiff’s plant, delay and error in machine work attributable to plaintiff and failure to purchase proper measuring equipment.
On December 10, 1956, the contracting officer terminated the subject contract for default. A contract (including the balance of the thrusters due under plaintiff’s contract) was let to the American Optical Company on February 28,1957.
On April 25,1957, the contracting officer issued his “Findings and Demand for Excess Costs” to plaintiff. This *806 document called upon plaintiff to make payment to the Government in the amount of $7,338.61.
Pursuant to the “Disputes” clause of his contract, plaintiff appealed both the termination for default and the assessment of excess reprocurement costs. In a decision announced November 30,1959, the Armed Services Board of Contract Appeals (hereinafter “ASBCA”) upheld the termination for default, and on April 29, 1960, it issued a second decision reducing the amount of excess reprocurement costs to $6,723.96.
Following the ASBCA determinations, plaintiff instituted suit in the United States Court of Claims. There followed substantial pretrial proceedings and an extensive trial, in which 954 pages of testimony were taken. On February 20, 1964, the trial commissioner assigned the matter, issued his opinion, findings of fact and recommended conclusions of law. He rejected plaintiff’s claims, save for one item of $356.20 representing damages suffered by plaintiff as a result of Government reworking of certain thruster bodies. He recommended recovery for the Government in the amount of $6,723.96 on its counterclaim for excess reprocurement costs, with a net recovery to the Government of $6,367.76. The court’s yer curiam opinion is dated December 11, 1964, and subsequently, the court denied a motion for a rehearing. Pursuant to plaintiff’s request, the Department of Justice acceded to payment of the aforesaid judgment in three installments. No interest was assessed as a result of these deferred payments.
No longer having any cause of action at law, plaintiff asserts in this reference that its claim for $24,890.52[2] lies comfortably within the bounds of the broad sweep of those “equitable claims” contemplated by 28 U.S.C. § 2509 (1970). Burhhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949) ; Rumley v. United States, 169 Ct. Cl. 100 (1965).
*807 Plaintiff grounds bis claim for relief on tlie following contentions:
1. As a result of plaintiff’s experience in manufacturing thrusters, defendant subsequently developed a method of plating the interior of the breech by means of a special rack.
2. In other contracts for the procurement of M3A1 thrusters (from the American Optical Company), the Government did not require the interiors of the breeches to be plated.
3. In reprocuring the 548 thrusters from American, the defendant was more interested in setting up a new plant for M3A1 thruster production than in getting-prompt delivery.
With regard to plaintiff’s initial contention, plaintiff’s own vice president testified that at the outset of the contract, plating of the breech interiors could have been achieved at a nominal additional cost by means of an internal anode device, and that at the time the issue arose during contract performance he had secured estimates for this process from various plat-ers. Thus, plaintiff’s claim that the Government “received a benefit by reason of plaintiff’s efforts and expenditures, for which the Government, in good conscience, ought to pay: Palmer-Bee Company v. United States, 142 Ct. Cl. 485, 489-90 (1958) ” is not supported by the facts.
Plaintiff’s second contention finds no support in the record. Indeed, an inquiry sent to American Optical Company by plaintiff’s counsel elicited a response which stated:
* * * it appears that throughout these contracts, the Government uniformly and consistently insisted upon plating of the Thruster breech. We believe that we plated the entire breech interior — even what you refer to as the “small hole”.
Defendant arranged for testimony to be presented by an employee of American Optical Company who had personal knowledge of the production of thrusters under American’s Southbridge contract with the Government. The witness testified that the interiors of these breeches were plated and had successfully undergone both a salt-spray test and visual inspection.
Plaintiff’s counsel relies on the fact that defendant did not call any representative of the A. A. Brunelle Electro *808 plating Corporation (a firm that had apparently done plating on some of American’s thruster contracts). Plaintiff states, in its opposition to defendant’s requested findings:
* * * Since this evidence was within defendant’s ability to produce, the fact that it did not produce such evidence must be considered as an admission on defendant’s part that such evidence would have been unfavorable to it: Fisher v. United States, [9]4 Ct. Cl. 511, 40 F. Supp. 997 (1941); Isham v. United States, 76 Ct. d. 1, 60 (1932).
Plaintiff’s reliance on these cases is misplaced. Witnesses from Brunelle Electroplating were by no means within the exclusive preserve of the Government, nor was their testimony necessary to establish an element of the Government’s defense. Plaintiff was free to call witnesses from the aforesaid firm and it chose not to do so.
Plaintiff’s third contention also lacks evidentiary support. Plaintiff’s contract was terminated for default, as plaintiff could not proceed to perform the contract in accordance with the specifications. It sought a termination of its contract for convenience of the Government, but this was refused by the contracting officer. As the court found in the trial of the earlier case (168 Ct. Cl. 873 at 918-19) :
22. Despite the urgent need of the Air Force for thrusters, Contract No. 4415, as finally negotiated, allowed American Optical nearly 16 months within which to deliver and also permitted the manufacturing to be accomplished at American Optical’s plants in Buffalo, New York, and Keene, New Hampshire, which plants had not previously manufactured thrusters. This appears to have been due to the fact that American Optical’s experienced plant at Southbridge, Massachusetts was then fully engaged in production of thrusters under Contract No. 4349. Defendant’s contract negotiator, however, anticipated that production of the thrusters at Buffalo and Keene would proceed smoothly by reason of American Optical’s previous experience with thrusters coupled with its ability to interchange its technical personnel already familiar with the various manufacturing problems involved. Nonetheless, American Optical did not complete delivery until June 1958, and it was not until December 20, 1957, that its deliveries under the *809 contract had exceeded even the 548 units terminated under plaintiff’s contract.
$ $ $ $ $
Plaintiff points to the following as additional considerations in its favor:
1. Its subcontractor furnished it certificates to the effect that plating had been performed in accordance with specifications.
2. Its subcontractor’s advice was that “stripping” the already plated parts in preparation for replatmg according to the Government’s interpretation of the specifications might reduce “the dimensions of the breech so that new breeches would have to be manufactured.”
These two points need not be dwelt upon. Plaintiff declined to hold its subcontractor accountable for failure to plate the breeches in accordance with specifications, and testimony clearly establishes that “stripping” parts without damage is a common procedure for any competent plater.
As plaintiff has not established the principal facts upon which it relies, it is not necessary to consider if they would be sufficient to entitle plaintiff to the relief it seeks. Accordingly, it is my opinion and recommendation that any payment to H & H Manufacturing Company, Incorporated of Clifton Heights, Pennsylvania would be a gratuity.
FiNdings op Fact
1. Plaintiff, H & H Manufacturing Company, Incorporated, is a corporation organized under the laws of Pennsylvania, with its principal place of business located in Clifton Heights, Pennsylvania.
2. On May 6,1955, Frankford Arsenal, Department of the Army, Philadelphia, Pennsylvania, issued an invitation to bid (No. OBD-36-038-55-866) for the manufacture of 1,031 thrusters, M3A1, in accordance with RE-BP-40, Rev. 3, dated April 10,1955, delivery F.O.B. Frankford Arsenal. A pilot lot of 15 thrusters was to be delivered by August 15, 1955, and production lots were to be delivered as follows:
316 by September 25, 1955; 316 by October 25, 1955; and 384 by November 25,1955.
*810 3. There were 21 bids submitted in response to the aforesaid invitation. Said bids ranged from a low of $19.13 to a high of $410 per item. On or about June 24, 1955, contract No. DA-36-038-ORD-19235 was entered into between plaintiff (low bidder) and the United States Army Ordnance Corps. The contract required plaintiff to manufacture and deliver 1,031 thrusters, M3A1, in accordance with RE-BP-40, Rev. 3, dated April 10, 1955, at $19.13 each, for a total consideration of $19,'T23.03.[1]
4. A thruster is a cartridge-actuated device employed in the escape system of jet aircraft. When actuated by the pilot in the event of an emergency, its function is to eject the flight crew from the aircraft. Being a lifesaving device, and containing explosives, it must be manufactured with precision to meet exacting standards.
5. The production of an M3A1 thruster unit required the manufacture of a number of components, including such major items as the breech, trunnion, cartridge, retainer, body, piston rod, end cap and end sleeve. The interior of the breech compares roughly with the bore of a rifle. The firing pin is assembled into it and must travel down the bore to detonate the cartridge contained at the end of the breech. The chemicals used to prepare the part for plating render any un-plated surfaces particularly subject to corrosion, a condition which is exacerbated by the temperature differentials and moisture encountered by aircraft operating at various altitudes. Failure of the firing pin to detonate the cartridge in a thruster due to corrosion surrounding the pin, spring and block assembly has been found to have been the cause of one fatal accident involving Naval aircraft.
6. By the end of March 1956', the plaintiff had delivered to Frankford Arsenal a total of 483 thrusters, all of which had been accepted and paid for by defendant. There remained 548 such thrusters to be delivered. Shortly thereafter, in the course of examining a breech component, the Government inspector arrived at the conclusion that the interior opening within the breech had not been plated. He communicated *811 this suspicion to Frankford Arsenal personnel who thereupon cut open one of the breeches previously manufactured by plaintiff. It was found that the inspector’s conclusion was correct and that, in fact, the interior of the breech had not been plated. During previous inspections, it had been assumed by the inspector that the small interior opening within the breech had been plated because plaintiff had furnished certificates from its subcontractor[2] to the effect that the plating required by the specifications had been accomplished.
7. Plaintiff agreed that the interiors of the breeches manufactured by it had not been plated by its subcontractor, hut it contended that such plating was not required either by the drawing or by .the specifications. The drawing for the breech specified that it should have protective finish of “TYPE I, CLASS T.S.C. (CADMIUM PLATE) SPEC. 57-0-2 * * There was no exception entered on the drawing to eliminate the breech interior from the plating requirement. However, plaintiff pointed to the fact that the breech interior could not be touched with a sphere % of an inch in diameter and therefore claimed an exception under the following paragraph of Specification 57-0-2:
E-le. TMcJmess. Unless otherwise specified the minimum thickness of plating on significant surfaces shall be as given in Table I. Significant surfaces (See paragraph H-7), for thickness determinations only unless otherwise specified, are those parts of the visible surfaces that can be touched with a sphere % inch in diameter.
8. The defendant, however, considered that the quoted specification related only to the required thickness of the plating and did not justify complete elimination of plating. Accordingly, in May 1956, defendant notified plaintiff that no more thrusters would be accepted by defendant if they were .unplated in the breech interior.
9. The court resolved this dispute in its opinion in H & H Mfg. Co. v. United States, 168 Ct. Cl. 873, 878-79 (1964):
* ¡a * m *
*812 There is conflict in the testimony with respect to trade practices in the plating industry where a small interior surface, such as this one, is involved. The weight of such testimony, however, favors the conclusion that an instruction on the drawing or in the specification requiring a protective coating or plating applies to the entire part, including small interior surfaces; that, further, to eliminate such interior surfaces from the plating requirement would necessitate a specific exception stated on the drawings or specifications. Accordingly, since here no exception was stated, it is concluded that plating of the breech interior was a contractual requirement in this case.
* * * ❖ *
10. When notified that all future breech interiors must be plated, plaintiff was also requested to submit a deviation request covering the 483 thrusters already accepted and paid for without such plating. However, plaintiff declined to submit such deviation request because it thought such action might be construed as an admission on plaintiff’s part that plating was in fact required by the contract.
11. As of June 11,1956, plaintiff had in its possession some 424 breeches which had been plated on the exterior only, and at least 100 breeches which had not been plated at all.
12. To cadmium plate the 100 or more unplated breeches it would have been necessary to fasten them to a rack which would have been immersed in plating solution. An electrolytic process would then have been used to cause cadmium to be deposited on the exterior surf aces of the units. To produce some cadmium coating on the entire interior surfaces of the breeches, the plating rack would have had to include an additional internal anode device for each such breech unit.
13. While counsel for plaintiff has endeavored to establish that the process of depositing cadmium plate on the interior surfaces of a breech unit via an internal anode rack had not been in use at the time of the manufacture of the subject items by H & H, he has not succeeded. Indeed, plaintiff’s vice president testified that there would have been only a nominal additional cost involved in plating the breech interior by means of such an internal anode device,[3] providing this operation was undertaken when the part was initially plated.
*813 14. To conform the 424 already plated breeches to the applicable plating specifications, it would have been necessary to remove the extant cadmium plating by means of a chemical “stripping” process, and then to replate according to the process outlined in finding 12, sufra. Whenever a part is “stripped” of its cadmium plate, there is an attendant risk of diminishing its dimensions which might in turn adversely affect its acceptability. However, “stripping” the parts without damage would be a usual undertaking by a competent plater.
15. In apparent disregard of the requirements of the “Disputes” clause of its contract, plaintiff declined to proceed with the production of the remaining 548 thrusters. Plaintiff contended, at the trial of its 1964 case in the court, that it was financially unable to proceed. By that time it had expended over $40,000 in performing a $20,000 contract, and its certified public accountant had advised management that if the loss to complete the contract were as great as the loss to date,[4] insolvency or bankruptcy would result.
16. On August 24, 1956, representatives of the Ordnance Corps visited plaintiff’s plant and ascertained that no progress was being made on the contract. An inspection of parts completed by plaintiff showed only a portion thereof to be acceptable. On August 27,1956, the contracting officer transmitted the following letter to plaintiff:
You are notified that since you have failed to perform Contract No. DA-36-038-OBD-19235 within the time required by the terms of the contract, the Government is considering canceling said contract pursuant to General Provisions 11 entitled “Default”.
It is requested that you submit to the undersigned Contracting Officer within ten (10) days from the date of receipt hereof, any facts or circumstances which you believe excuse your failure to perform.
Your attention is invited to the respective rights of the Contractor and the Government under General Provisions 11 entitled “Default” and the penalties which may be involved in the event the decision is made to •terminate your right to proceed.
*814 17. Plaintiff responded by a letter dated September 6, 1956, in which, its problems with the work under the contract were discussed at length. Plaintiff concluded its response as follows:
Along with our $25,000.00 loss from flood damages and result in [sic] loss on jobs of our other customers, due to the same condition, we have a net loss involved in the company in the last ten months of close to $75,000.00 which has put us very close to bankruptcy, we are struggling to hold our company together. If the Government elects to declare us in default and exact a penalty, we will be forced to go out of business.
We have only one solution to offer and we wish to ask your consideration and that is, that the Contract be terminated at no cost to the Government and also at no cost to H & H Manufacturing Company, Inc. We will take our loss and realize that it will take us another year or two to put our Company back on its feet. The parts that we have on hand and those that could be salvaged, we would request permission to sell to your other Vendor now working on this assembly.
❖ % % ❖ ❖
18. Following receipt of plaintiff’s letter of September 6, 1956, a conference was held at plaintiff’s plant. Plaintiff informed the Ordnance Corps that it would be physically and financially impossible for plaintiff to complete the contract. The only further work which plaintiff considered it would be able to proceed with on the contract was the reworking of the 137 bodies, and other parts previously returned by Frank-ford Arsenal. Plaintiff agreed to return these reworked parts by November 15, 1956. Plaintiff further agreed to write a letter to Ordnance stating that it could not continue work on the contract. Accordingly, in a letter to the Ordnance Corps dated October 22, 1956, plaintiff stated in pertinent part:
As we stated in our meeting, our financial position is precarious and because of the definite lack of working-capital incurred by our heavy loss of this past year, it would be impossible for us to reschedule the balance of the items due on this contract. We will, however, complete the three (3) items which were returned for rework, and shall endeavor to have them in your hands on or before November 15.
*815 * * * It is going to be a long, hard pull to try and save this business and we sincerely hope that you will be in a position to terminate this contract as outlined in our previous letter.
19. On December 10, 1956, the contracting officer issued formal findings of fact setting forth the negotiations regarding plaintiff’s performance, and pointing out that the delivery date for all thrusters required had not been extended beyond March 16, 1956. The contracting officer then concluded:
13. Based upon the above Findings of Fact, I hereby determine that the contractor having delivered only 483 acceptable units under the contract, which called for 1031 units, is therefore in default as to the remaining 548 units and that said default is not due to any circumstances that would amount to an excusable delay.
14. In accordance with the above Determination and Findings of Fact, the Contracting Officer hereby terminates Contract No. DA~36-038-OKD-1923'5 for default.
15. In the event the supplies called for under subject contract are repurchased by the Government from other sources, your company will be held accountable and liable for any excess cost incurred by the Government because of said repurchase.
20. On October 11, 1956, the Ammunition Group Procurement Assignment Board of the Ordnance Corps convened its membership for the purpose of reviewing pending plans for the “urgent procurement” of 1,902 M3A1 thrusters. The minutes of the Board meeting read, in part, as follows:
The Board was reluctant to consider a recommendation for negotiation with one source of supply and investigated the possibility of utilizing additional sources for competitive procurement. It was found that the only other source (H. & H. Manufacturing Company, Incorporated) familiar with the manufacture of this item could not deliver under its present contract and termination proceedings were in process. (Contract DA-36-038OBD-19235.) It was therefore concluded that due to the minimum lead time and urgent delivery date negotiation with a facility in production offered the only practical solution.
*816 Eegarding the delinquent status of Contract DA-36-038-OED-19235, it was recommended by tbe Board that a quotation for this quantity of 548 each also be solicited from the American Optical Company so that a better price could be obtained for this small quantity now urgently required to meet minimum Air Force requirements. By this arrangement all urgent quantities can be obtained by the same action and repurchase costs held to a minimum.
‡ ‡ $
Based on the foregoing, concurrence for allocation to the Boston Ordnance District for negotiation with the American Optical Company, the only current producer was given.
21. It was thought that by including the 548 thrusters undelivered under plaintiff’s contract as a portion of a larger contract, repurchase costs could be held to a minimum. By this time, the M3A1 thruster being procured was to be manufactured pursuant to EE-BP-40, Eev. 4, rather than to the Eev. 3 under which plaintiff’s contract had been let. Accordingly, the Boston Ordnance District solicited a quotation on alternative bases. American Optical was asked to supply a per unit price solely for a quantity of 1,902 M3A1 thrusters manufactured pursuant to Eev. 4. As an alternative, a per unit price was requested for 1,902 M3A1 thrusters manufactured pursuant to Eev. 4 and 548 such thrusters manufactured according to Eev. 3.
22. American Optical Company’s per unit price for both alternatives was the same — $38.40. On November 28, 1956, American Optical was awarded contract No. DA-19-020OED-4349 for a quantity of 1,902 M3A1 thrusters pursuant to EE-BP-40, Eev. 4, at a unit price of $38.40, which price was reduced through further negotiations to $34.90. As plaintiff’s contract was not terminated until December 10, 1956, no funds were available to add the 548 undelivered units under plaintiff’s contract to contract DA-19-020-OED-4349 at the date of its award to American Optical.
23. Four days after plaintiff’s contract had been terminated for default, the Ammunition Group Procurement Assignment Board again held a meeting for the purpose of considering the procurement by direct negotiation of the 548 M3A1 thrusters still undelivered under plaintiff’s contract *817 and an additional quantity of 2,013 M3A1 thrusters required by the Air Force — a total of 2,561 M3A1 thrusters. The minutes of that Board meeting read, in part, as follows:
* * * Since the administrative and production lead time for the furnishing of these items is seven (7) months, only a proven producer presently in production can meet the vital delivery requirements. Accordingly, procurement by negotiation is found justified pursuant to the exception set out in 10 USC 2304(a) (2). Direct allocation will be made to the Boston Ordnance District for placement as a supplemental award with the American Optical Company under their present contract DA-4349. It has been determined that the American Optical Company has the additional productive capacity to meet the Air Force requirements.
24. On December 28, 1956, the Ordnance Corps at Frank-ford Arsenal transmitted the procurement authority to the Boston Ordnance District by letter reading in pertinent part as follows:
1. This Arsenal has a requirement for an additional quantity of 2561 each, Thrusters, M3A1 which item is now being manufactured by the American Optical Company under Contract DA-19-020-OKD-4349. Your district is requested to negotiate solely with the American Optical Company for this urgent requirement and extend all efforts to meet the critical delivery desired.
25. Boston Ordnance District thereupon solicited quotations from American Optical. Again, as in the case of negotiations for contract DA-4349, American Optical was requested to quote on thrusters under alternative bases, depending upon whether the manufacture was to be pursuant to Bev. 4 or Kev. 3. As in the case of the preceding contract, however, American Optical again had identical quotations under both alternatives, but at a lower figure — $31.92 per thruster. To that quotation (under either alternative), American Optical added the cost of $2,479 for special tooling (gauges), raising the unit price to $32.87.
26. The Price Analysis Branch of the Boston Ordnance District thereupon conducted a detailed price analysis of the American Optical quotation and concluded that $32.87 constituted a fair and reasonable price. Defendant’s contract negotiator made one final effort to obtain a price lower *818 than $32.87 but had no success. Shortly thereafter (on February 28, 1957), the Government and American Optical entered into contract No. DA-19-020-OBD-4415, calling for the manufacture of 2,605 M3A1 thrusters under Bev. 4 at a per unit price (including special tooling) of $32.87. The 2,605 thrusters thus contracted for included replacements for the 548 thrusters plaintiff had failed to deliver under its contract. The price obtained by Boston Ordnance District under this new contract was $2.03 per thruster less than the previous price obtained under contract No. DA-19-020OKD-4349 with American Optical.
27. Despite the urgent need for these thrusters, contract No. 4415 as finally negotiated allowed American Optical nearly 16 months within which to deliver the units and also permitted the manufacturing to be done at its plants in Buffalo, New York and Keene, New Hampshire, which plants had not previously manufactured these items. This appears to have been due to the fact that the American Optical plant in Southbridge, Massachusetts (experienced in thruster manufacture) was then fully engaged in the production of thrusters under contract No. 4349. Defendant’s contract negotiator anticipated that production of the thrusters at Buffalo and Keene would proceed smoothly by reason of American Optical’s previous experience with thrusters, coupled with its ability to interchange its technical personnel already familiar with the various manufacturing problems involved. Nonetheless, American Optical did not complete delivery until June 1958, and it was not until December 20, 1957, that its deliveries under the contract had exceeded even the 548 units terminated under plaintiff’s contract.
28. On April 25, 1957, the contracting officer issued his “Findings and Demand for Excess Costs” to plaintiff. The contracting officer found that the 548 undelivered units under plaintiff’s contract had been reprocured at a unit cost of $32.87163, for a total cost of $18,013.65. The contracting officer further found that the cost to the Government for the 548 units, had plaintiff performed its contract, would have been $10,675.04 (548 units at $19.48 each). Excess costs were thus found to be $7,338.61, and the contracting officer issued *819 his determination to this effect, coupled with a demand for payment.
29. Pursuant to the “Disputes” clause of its contract with defendant, plaintiff appealed the termination for default decision of the contracting officer to the Armed Services Board of Contract Appeals. Numerous exhibits were presented to the ASBCA 'by both parties. Commencing on October 7, 1958, the ASBCA heard testimony presented by witnesses for both parties. Plaintiff presented: Paul S. Nikazy (vice president of H & H), Poland F. Beagle (former plant superintendent of H & H), Elmer B. Pamsey (former quality control manager and later production manager of H & H), and Nathan S. Stredler (a certified public accountant whose firm was at that time in the employ of H & H). The Government presented six witnesses. The transcript totaled 498 pages. On November 30,1959, the ASBCA issued its decision upholding the termination action. A second hearing was then scheduled to consider plaintiff’s appeal from the assessment of $7,388.61 in excess reprocurement costs. This hearing commenced February 17, 1960, and entailed more than an additional 100 pages of transcript. On April 29,1960, the ASBCA issued its decision, reducing the said excess reprocurement costs to $6,723.96.
30. Following the issuance of the ASBCA decisions, plaintiff instituted suit in the United States Court of Claims. There followed substantial pretrial proceedings and an extensive trial in Philadelphia, Pennsylvania, at which 954 pages of testimony were taken. Substantial written submissions were received by the trial commissioner assigned the case. On February 20, 1964, the commissioner issued his opinion, findings of fact and recommended conclusions of law in which he rejected plaintiff’s claims, save for one item of $356.20 representing damages suffered by plaintiff as a result of Government reworking of certain thruster bodies. The commissioner recommended recovery for the Government in the amount of $6,723.96 on its counterclaim for excess reprocurement costs, with a net recovery for the Government of $6,367.76. Plaintiff excepted to the commissioner’s report. On December 11,1964, the court by per curiam opinion, adopted the commissioner’s report. Plaintiff’s motion for *820 rebearing was denied on March 12,1965. H & H Mfg. Co. v. United States, 168 Ct. Cl. 873 (1964).
Pursuant to plaintiff’s request, the Department of Justice acceded to payment of the aforesaid judgment in three installments and this was accomplished. No interest was assessed as a result of these deferred payments.
31. On October 26, 1970, plaintiff filed its petition in the ■instant matter asserting (among other things) that the American Optical Company had performed certain contracts for the M3A1 thruster wherein it had not been required to plate the interior of the breech unit. On March 8, 1971, plaintiff filed a motion for call or discovery in which it sought records concerning certain thruster contracts performed by American Optical. The motion stated, in part, as follows:
* * * If, in the performance of such contracts, American Optical Company did not plate the small hole in the breech of the Thruster, and such 4,461 Thrusters under contracts Nos. DA19-020-ORD-3723, DA19-020-OKD-4132, and DA19-020-ORD-4349 were not so plated, then plaintiff’s equitable claim is established since the conscience of the nation would be offended if American Optical Company were allowed to deliver such M3A1 Thrusters without plating the interior of the breech, and plaintiff were required to plate the interior of such breech and suffered loss or damages by reason thereof.
32. On February 11,1971, plaintiff’s counsel wrote counsel for the American Optical Company in Southbridge, Massachusetts, stating in part:
In April 1963 your Mr. W. K. Hannan advised our Mr. Paul S. Nikazy that in the Thruster production * * * at American Optical Company’s Keene, New Hampshire plant, the Government forced American Optical Company to fíate the hole in the Breech against their version of the requirement. Also that it develo fed into a very difficult of oration ¡became of the need to meet dimensional and smooth {32 micro.) surface finish. *****
We believe that in the performance of the three contracts for the total of 4,461 Thrusters, in the South-bridge, Mass, plant, American Optical Company did not plate the small hole in the breech. We never believed it was necessary to do so since it was a completely sealed assembly area with O-ring seals, and with 800 pound *821 static pressure the unit did not leak and, withstanding this pressure, it was effectively sealed against any atmosphere or anything else.
In the above-quoted letter, plaintiff’s counsel also noted that the trial commissioner assigned to this case would schedule a trial in Worcester, Massachusetts “to take American Optical Company’s testimony” and requested the assistance of the company in this respect.
33. Upon receipt of plaintiff’s request, American Optical Company commenced its research and transmitted its findings to plaintiff’s counsel by letter dated March 2,1971, which stated, in part, as follows:
I hope you will understand that your request for information about our Thruster Contracts has been very difficult to research because it involves events occurring about 15 to 16 years ago, and we do not keep contract records for such a long time. By chance, we do have a few records left. What follows is a summary of what I have 'been able to learn from these records and through discussion with some of our people:
* * $ * *
Our technical people do not agree with the interpretation of the Specification in the fourth paragraph of page one of your letter. “Under Specification QQ-P-416 plating was not required in the interior opening which could not be touched by a sphere %" in diameter, and the interior of the breech could not be contacted with a %" ball.” We think that this ball test concerns the thickness of the plating on certain specified surfaces, but it is not relevant to the question of plating or not plating a particular item. We feel that Specification QQ-P — 416 a section 3.4.2 is the relevant specification for all the Thrusters made, both in Southbridge and Keene, by American Optical. This specification is the salt-spray test, by which the Thruster breech after being plated, as well as other parts plated, was subjected to salt-spray for a period of 96 continuous hours. If any part of the breech was not plated, white corrosion would appear and the part would be rejected. Our people also point to section 4.3.3, which is a requirement for destructive testing. They say that under this section a sampling of Thruster breeches would actually be cut in half and examined in detail after the salt-spray test for evidence of corrosion.
*822 As for your reference to Mr. W. K. Hannan on page two, Mr. Hannan tells me that he cannot remember at this time whether he did or did not have a conversation with Mr. Nikazy and therefore, he is unable to make any factual statement relating to Mr. Nikazy’s comments.
In talking to people in our company who are familiar with the work on Thrusters done in both Southbridge and Keene, it appears that throughout these contracts, the Government uniformly and consistently insisted upon plating of the Thruster breech. We believe that we plated the entire breech interior — even what you refer to as the “small hole”.
Our belief is based upon the evidence, small though it may be, and the recollection of the people involved whom we still have with us, 15 to 16 years after these contracts were performed. Moreover there is the fact that the plating work done to the Thrusters fabricated in Southbridge was subcontracted to two local firms, one being Harvey-Wells Electronics, Southbridge, and the other, A. A. Brunelle Electroplating Co., Sutton Lane, Worcester, Massachusetts. I understand that the Harvey-Wells Company stopped operating some time ago. Its business may have been continued by Sped Cor Electronics Inc., Bay State Division, 64 Mill Street, South-bridge. We have not asked either Sped Cor or Brunelle Company for their help in answering your request. The plating of Thrusters made in Keene was done by our own work force in plant.
34. Following completion of pretrial proceedings, trial in the instant matter was held in Philadelphia, Pennsylvania. Plaintiff did not make arrangements to present testimony from American Optical Company personnel. Defendant did arrange for testimony to be presented by an employee of American Optical who had personal knowledge of the production of thrusters under American Optical’s Southbridge contracts with the Government. This witness testified that the interiors of these breeches were plated and had undergone salt-spray tests, as well as visual inspection.
Conclusions
1. Plaintiff’s legal claims arising out of its performance of work under the subject contract were fully adjudicated before this court and reported at 168 Ct. Cl. 873 (1964).
*823 2. The claim asserted by plaintiff in the present proceeding is not legal in its nature or character.
3. The claimant has no equitable claim under the terms of the Congressional Reference statutes.'
4. Any further payment to the H & H Manufacturing Company, Incorporated of Clifton Heights, Pennsylvania, arising out of performance of work under the subject contract would be a gratuity.

 The entire record in this case was stipulated into evidence heroin.

 Representing a recovery of tile $6,367.76 judgment previously awarded the Government on Its counterclaim In its case cited above and $18,522.76 for losses allegedly attributable to contract performance. Plaintiff claims these alleged losses would have been avoided had it been permitted to deliver the remaining 518 thrusters, thus enabling it to obtain the balance of the contract funds as well as to avoid “nonproductive overhead.”

 On September 27, 1955, the unit price was adjusted to $19.48 for a total consideration of $20,083.88, and was later further adjusted to $20,063.48. No changes were then made in the contract completion date.

 j. w. Res Company, Chem-Pin Division. Plaintiff’s witness (Paul S. Nikazy) testified that no action had been taken against Chem-Pin or its parent company by H & H. The witness also testified that by 1960 the Chem-Pin Division was no longer operating, but that the parent, J. W. Rex Company, continued to operate as of the date of this trial.

 As late as 1969 such a device was priced at $38.

 Losses resulted from flood damage, delay and error in machine work attributable to plaintiff and failure to purchase proper measuring equipment.