OPINION*
Cooper, Trial Commissioner:
On September 26, 1972, the Senate referred S. 8451, 92d Cong., 2d Sess., a bill for the relief of the Crown. Coat Front Co., Inc., to the Chief Commissioner for proceeding's in accordance with 28 U.S.C. §§ 1492 and 2509 (1970). The bill proposes that the Secretary of the Treasury be authorized and directed to pay Crown Coat Front Co., Inc.,
* * * the sum of $95,000, in full satisfaction of all claims of such company against the United States for reimbursement for losses incurred under contracts numbered QM-7726, dated April 26, 1956, and QM-7796, dated May 14,1956, entered into between such company and the United States, such losses having occurred as the result of inadequate testing by the United States * * *.
The two contracts in issue were for the manufacture of canteen covers lined with felt. Plaintiff originally bid for the manufacture of 760,000 dismounted canteen covers. After a preaward survey, however, the Government, pursuant to its reserved right to make an award for less than the amount bid, awarded plaintiff contract No. QM-7726-OI-2391-E-56 (hereinafter QM-7726) for 850,000 units. The contract called for monthly deliveries in specified quantities between July 25 and November 24, 1956. Plaintiff protested this reduction in quantity but agreed to accept the award. The protest was withdrawn after plaintiff negotiated a separate contract, No. QM-7796-OI-2567-E-56 (hereinafter QM-7796), for 89,786 additional covers.
*656 From the outset, plaintiff had difficulty in meeting its contract schedule. After one time extension, plaintiff was able to deliver all of the 89,786 covers under contract QM-7796. After two time extensions and a partial convenience termination reducing the units due under contract QM-7726 from 350,000 to 284,000, plaintiff actually delivered 251,600 covers before the contract was terminated for default.
Most of the work on the contracts was performed concurrently. Both contracts provided that preproduction samples of component parts were to be submitted for specification testing by the Government. One of the tests conducted by defendant, the colorimetric test, was used to determine if the felt samples contained the required amount of mildew inhibitor (DDDM). Since the requirements for the felt were the same under both contracts, and all of the felt came from the same supplier, the Government conducted only one series of tests on each lot.
On the basis of the colorimetric-test results, the Government rejected 10 out of the 12 lots submitted due to unacceptable mildew-inhibitor content. All of the felt was, however, used on the contract because, for each rejected lot, plaintiff offered, and the Government accepted, a price reduction. Out of the 89,786 covers delivered under contract QM-7796,54,000 contained nonspecification felt. For this deviation, the original contract price of $60,691.76 was reduced by $270.01. In consideration of the time extension granted, an additional $112.23 was deducted from the contract price. Out of the 251,600 covers delivered under contract QM-7726, 234,824 contained nonspecification felt. The original contract price of $204,750 was reduced by $1,334.14 for this deviation; a reduction of $320.20 was also agreed upon for 33,680 units containing nonspecification thread, as well as a $1,272.50 reduction in consideration of the two time extensions granted.
Plaintiff contends that the colorimetric test “is very inaccurate and unreliable” and “was an ineffective method for determining the mildew-inhibitor content of colored felt.” Therefore, plaintiff argues, it was “inequitable and unjust for the defendant to have not only rejected plaintiff’s felt samples by the colorimetric method, but also to have insisted that each sample of felt be tested, reported, rejected, price *657 reduction offered, evaluated, considered and accepted.” Accordingly, plaintiff seeks to recover, upon principles of “general equitable considerations,” $80,397.96 of “losses” sustained on the contract, suck alleged losses consisting primarily of delay costs for an aggregate of 442 days.
Plaintiff’s present contentions are largely a repeat, with some variations in theme, of the unsuccessful theories asserted by plaintiff in its previous efforts to recover on these contracts. (Findings 35-39). Plaintiff first argued to the Armed Services Board of Contract Appeals that its delay on contract QM-7726 was excusable because the Government took an unreasonably long time in finally accepting the felt. After the Board rejected this contention,[1] plaintiff argued it again to this court in Crown Coat Front Co. v. United States (Ct. Cl. No. 222-58), 154 Ct. Cl. 613, 292 F. 2d 290 (1961), along with the argument that the Government breached the contract by rejecting the felt on the basis of tests not specified hi the contract. This court held that (1) under a proper interpretation of the contract, the Government could perform reasonable and necessary tests to determine if the submitted materials complied with the specifications ; (2) the colorimetric tests used by the Government were reasonable and necessary and were accomplished without undue delay; and (3) plaintiff itself was responsible for the delay by repeatedly accepting nonspecification felt from its supplier.
In connection with contract QM-7796, plaintiff sought an equitable adjustment for the delay costs allegedly incurred as a result of the rejections of the felt. Plaintiff also argued to the ASBCA that the colorimetric tests were improper, because, again, the contract did not specify that test and because the Parr chloride test was not also performed. None of these arguments prevailed.[2]
Before any decision by the Board in the latter case, plaintiff also filed a breach of contract action in this court. After the ASBCA ruled against it, plaintiff sought to have that decision overturned in the United States District Court for the Southern District of New York. The United States Court *658 of Claims suit was dismissed without prejudice due to the pendency of the district court action. After extensive litiga-, tion, set out more fully in the findings, including a Supreme Court decision and remand, and denial of certiorari after remand,[3] plaintiff’s suit in the district court was held to be barred by the statute of limitations. The Court of Claims subsequently denied plaintiff’s motion to reinstate its petition ; however, the issues raised in that petition were substantially similar to those decided by the court in Ct. Cl. No. 222-58. In any event, it was plaintiff’s legal strategy and maneuvering that precluded further adjudication on QM-7796.
In its petition here, plaintiff makes four major contentions that (1) the colorimetric test itself is subject to inaccuracy and unreliability; (2) defendant acted unfairly by failing also to perform the Parr chloride test on the felt; (3) since the felt was ultimately accepted and used by the Government, it was inequitable and unjust for defendant to reject plaintiff’s felt samples and to request, on each event, that plaintiff submit an offer in price reduction; (4) the whole process of testing, rejection, negotiation, and acceptance disrupted plaintiff’s performance schedule so as to cause plaintiff substantial losses.
In support of its first contention, plaintiff has presented the testimony of one expert, Dr. Wood, who investigated, at plaintiff’s request, the reliability and reproducibility of the colorimetric test. All of Dr. Wood’s testimony concerning possible sources of error in the colorimetric test was based on experiments he conducted expressly for this proceeding and which are summarized in the findings. The bulk of Dr. Wood’s dissatisfaction with the test was based on his experience of rapid color fading within the first few hours and confusion of the DDDM color with the dye color. Both of these, according to Dr. Wood’s testimony, however, would always yield results reflecting more DDDM than actually present, never less. Since all of the felt rejected by the Government contained too little DDDM content, these problems, assum- *659 mg they do constitute deficiencies in the test, would only have been beneficial to plaintiff. Dr. Wood also testified as to other possible sources of error suggested by his experiments: loss of DDDM in the extraction process; inefficiency of the extraction process; and removal of some DDDM through the addition of the moisture-resistant treatment. Some of the irregularity in results observed by Dr. Wood may be explained by certain deviations in his procedures, as pointed out by Government witnesses. In any event, the minor deficiencies observed by Dr. Wood are not sufficient grounds to discredit the colorimetric test, which has had longstanding and widespread use in Government and industry.
Dr. Wood conceded that all analytical procedures have weaknesses and admitted that he knows of no test better than the colorimetric test. Government witnesses also conceded that the colorimetric test is not perfect but contended that it gives reasonably accurate results.
It is worth noting, as this court and the ASBCA did in the previous decisions, that at no time during the performance of either of these contracts did plaintiff question the accuracy of the colorimetric test. When, at a later time, it argued to this court that use of the test was improper under the terms of the contracts, it still did not contend there was any inaccuracy or unreliability in the test. Indeed, plaintiff’s own expert in Ot. Cl. No. 222-58 testified, in direct examination, that the colorimetric test was “accurate to a reasonable degree of accuracy.”
It should also foe noted that the present proceedings mark the first time in over 15 years that plaintiff has attempted to establish that the felt actually contained the required amount of DDDM. Dr. Wood’s tests, the results of which are summarized in findings 43-45, were conducted on felt samples supplied by plaintiff’s counsel and which were allegedly left over from the contracts in issue. However, a lack of satisfactory evidence regarding the origin of the felt samples analyzed, the conditions under which the felt had been kept over the years, and the effect of such a long lapse of time on the felt, preclude any significant weight being given to those test results. Moreover, the time for plaintiff to have contested the test results was back in 1956 when specific lots *660 of felt were being tested. Instead, it elected to sit back, neither conducting tests of its own nor challenging those of defendant. The plain fact is the parties treated the test results as correct at the time they were made, and conducted their business on that assumption. The contemporaneous respect accorded the tests by the parties themselves is entitled to much more weight than tests conducted many years later on a piece of felt of unknown origin and condition.
Accordingly, it is concluded that the colorimetric test is a reasonably accurate test; that plaintiff has failed to show that the felt it supplied did meet the specifications; and that plaintiff has failed to show any inequity in defendant’s use of the colorimetric test in the administration of these contracts.
Plaintiff also contends that the Government acted improperly in not administering the Parr chloride test after the felt failed by the colorimetric method.[4] Plaintiff makes two arguments in support of this contention. First, plaintiff suggests it should have been used because the specifications for Thread and Twine, MIL-T-3530A (November 3, 1952), in existence at the time of the contracts, provide that if a material fails under the colorimetric test, the Parr chloride method is to then be used, and the results of that test are to be final. That argument fails because there is uncontradicted credible testimony that thread and twine are not similar in composition or character to felt, and, hence, the provisions of that specification would not necessarily be applicable to this contract. Second, plaintiff urges that it was standard procedure for the Government to use both tests. While there is evidence in the record, both in Ct. Cl. No. 222-58 and in this proceeding, that both tests were usually employed, plaintiff has failed to show that defendant had any obligation under these contracts to use that test.
The Parr chloride test has its weaknesses, as do all analytical procedures, and is subject to certain interferences. Since *661 plaintiff did not object to the colorimetric-test results at the time, and since the Parr chloride test would have involved additional time and delay, it is difficult to find any inequity in the single-test procedure used by defendant.[5] In the final analysis, plaintiff’s failure to show any error in the colorimetric-test results renders the Parr chloride issue largely academic.
In sum, plaintiff has failed to show that the Parr chloride test was a superior test, that it would have produced any different results, that the Government had 'any obligation to use that test, or that plaintiff was disadvantaged either legally or in an equitable sense by the single-test procedure.
Plaintiff’s last two contentions merit only brief mention. Since the Government actually used the canteen covers with the nonspecification felt, plaintiff argues, it was inequitable for the Government “to request * * * that plaintiff submit an offer in price reduction.” In Ct. Cl. No. 222-58, this court found, with ample support in the record, that it was plaintiff who, upon each notification that the felt was unacceptable, initiated negotiations for a reduction of contract price. No evidence has been presented by plaintiff in this proceeding otherwise. The Government’s right to insist on compliance with the contract specifications is well established. H.L.C. da Associates Constr. Co. v. United States, 176 Ct. Cl. 285, 367 F. 2d 586 (1966); Farwell Co. v. United States, 137 Ct. Cl. 832, 148 F. Supp. 947 (1957). It is equally well established that the Government’s agreement to accept nonspecification materials does not deprive it of its right to insist on a price reduction. Farwell Co. v. United States, supra. In any event, the total price reductions were so small, $270.01 out of an original $60,691.76 on contract QM-7796 and $1,334.14 out of an original $204,750 on contract QM-7726, that the loss suffered by plaintiff was negligible, especially in view of the fact that over 80% of the covers delivered by plaintiff contained nonspecification felt.
Plaintiff’s last contention is that “it was inequitable and mi just for the defendant * * * to have insisted that each sample of felt be tested, reported, rejected, price reduction *662 offered, evaluated, considered and accepted.” This process, plaintiff alleges, caused it prolonged performance delays resulting in substantial losses on the contracts. However, this contention is largely answered by this court’s conclusions in the earlier case, where it stated:
* * * We think- that the record establishes that plaintiff was responsible for most of the delay incident to the performance of the contract simply because plaintiff repeatedly accepted felt from its supplier, Western Felt Works, which failed to meet the requirements of the contract and specifications. Following each of several rejections by defendant, the supplier continued to assure plaintiff that its next shipment of felt would measure up to the Government’s requirements. The goal was never realized. Plaintiff ultimately ceased to make protests to its supplier with respect to the quality of the felt being supplied and never made a change in its source of felt. It could have obtained felt from another supplier at considerably less cost, but did not elect to do so. [154 Ct. Cl. at 617, 292 F. 2d at 293.]
It was plaintiff’s repeated submissions of nonconforming felt that was the root cause of the problems encountered under these contracts. Although the Government did ultimately conclude that -the lack of adequate mildew inhibitor did not adversely affect the overall performance of the canteen covers, it also found that there was a cost savings to the contractor resulting from the omission of the inhibitor, the amount of the cost savings being dependent on the amount of inhibitor actually used. Also, some lots of felt were rejected for reasons in addition to inadequate inhibitor. Under these circumstances, the Government’s testing and evaluation of each lot before agreeing to a price reduction was a reasonable, and responsible, method of 'handling the problem plaintiff created.
It is concluded that Crown Coat Front Co., Inc., has no claim of an equitable nature,[6] see, Webb v. United States, 192 Ct. Cl. 925 (1970); Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949), against the United States and that any payment to it would be a gratuity.[7]
*663 CONCLUSION
It is recommended, that it be reported to the Senate that the claimant, Crown Coat Front Co., Inc., does not 'have any legal or equitable claim against the United States and that any payment to it would be a gratuity.
Beeort to ti-ie United States Senate
Before Schwartz, Presiding Commissioner of the Review Panel, Colaianni and Miller, Commissioners.
By the Review Panel:
Senate Besolution 290, 92d Cong., 2d Sess., of September 22, 1972, referred S. 3451, 92d Cong., 2d Sess., to the Chief Commissioner of the United States Court of Claims for proceedings and report pursuant to 28 U.S.C. §§ 1492 and 2509 (1970). S. 3451 would authorize the payment of $95,000 to the claimant, Crown Coat Front Co., Inc., to reimburse it for losses suffered under two contracts with the United States, No. QM-7726 of April 26, 1956, and No. QM-7796 of May 14, 1956, allegedly as the result of inadequate testing by the United States.
The Chief Commissioner referred the bill to Trial Commissioner Hal D. Cooper who on January 31, 1975, filed an opinion and detailed findings of fact and a recommended conclusion. The exceptions of the claimant-plaintiff to the opinion, findings and conclusion have been heard on briefs and at an oral hearing held on November 4,1975.
Plaintiff’s claims arising from both the contracts have previously been rejected in legal proceedings both in this court and other courts; in the latter proceedings the district court’s dismissal of the claim was affirmed on appeal and certiorari was denied by the Supreme Court. Crown Coat Front Co. v. United States, 154 Ct. Cl. 613, 292 F.2d 290 (1961); Crown Coat Front Co. v. United States, 363 F.2d 407 (2d Cir. 1966) (en banc), 386 U.S. 503 (1967) (rev’d and remanding), 275 F. Supp. 10 (S.D.N.Y. 1967) (on re *664 mand), aff'd 395 F.2d 160 (2d Cir. 1968), cert. denied, 393 U.S. 853 (1968). In the present proceeding, therefore, plaintiff stipulated that its claim was solely equitable, that is, that it made no legal claim against the United States. After trial on the merits Trial Commissioner Cooper filed an opinion and detailed findings of fact, on which he concluded that the plaintiff 'has no claim of an equitable nature against the United States and that any payment to it would be a gratuity. Accordingly, he recommended that it be reported to the Senate that the plaintiff does not have any legal or equitable claim against the United States and that any payment to it would be a gratuity.
On this proceeding for the review of the trial commissioner’s decision, the plaintiff has made a variety of contentions critical of the decision. We have considered all the arguments made and found them to be without merit. None of .them require discussion beyond what appears in Trial Commissioner Cooper’s opinion, except for the contention that the trial commissioner erred in holding himself bound by the findings of fact in the earlier decision on the claim in this court. The questions raised by the contention are whether Trial Commissioner Cooper ruled that the facts found in the 1961 suit at law are binding in this Congressional Reference proceeding, and whether he erred in whatever rulings he did make. The substantive question was touched upon but not decided in H & H Manufacturing Company v. United States, Congressional Reference No. 3-70, 201 Ct. Cl. 799 (1972).
The first question is answered in the negative. The trial commissioner did not make such a ruling as is complained of. The parties having stipulated that the record in the 1961 proceeding in this court should be received in evidence, the trial commissioner in an order of June 8, 1973 directed that tire parties advise which of the earlier factual findings would be stipulated and, as to findings on which the parties disagreed, that the objecting party identify the finding and indicate the factual basis for challenging it. In describing this order, the trial commissioner wrote, in a subsequent order of September 21, 1973, that it “does not assume that the findings in the prior litigation are *665 binding in this congressional reference proceeding”; rather that its purpose was to determine whether there was factual matters not in controversy which could be stipulated.
Thereafter, the plaintiff made denials of various findings of fact 'but failed to state either the basis for the denials or the facts believed to be correct. When directed to make such a statement, the plaintiff denied the factual content of 54 findings of ¡fact for lack of knowledge, and demanded proof thereof. On this, the trial commissioner on December 19, 1973 entered an order that the statement of lack of knowledge should be construed as meaning that claimant had no evidence contrary to the finding of fact involved. Further, that those “prior findings to which no new evidence is directed shall be adopted in this case, provided they are relevant and material.”
On the trial which followed, the plaintiff opposed the 61 findings of fact proposed by defendant from among the prior findings, on the grounds that plaintiff had introduced new evidence directed to those prior findings and that they were not relevant and material. These grounds were rejected on their merits by the trial commissioner, who on his consideration of the record, adopted a substantial number of the former findings, which he found to be “material, relevant, and supported by the entire record.”
Findings of fact are binding in a second judicial proceeding between the same parties, under the classic principle of res judicata. A fundamental doctrine in our law is .that issues once decided in litigation before a competent tribunal must remain settled as between the litigating parties, in the absence of fraud or comparable reason for reopening the matter.
There is arguably good reason to apply the doctrine in a Congressional Reference proceeding between the parties to an earlier proceeding at law, provided the House referring the case does not otherwise direct. But there is no need to pass on the question in the circumstances presented, for the trial commissioner did not invoke the principle of res judicata. He did not hold that the former findings were binding; he rather held that they could be objected to on the basis of new evidence, and that those *666 findings against which no new evidence was raised would be adopted, provided they were relevant and material Since the former record, including the findings on the evidence presented, was in evidence, and since these former findings had in the earlier proceeding been held well-based it was entirely correct for the trial commissioner to adopt those findings, once it appeared that an objecting party had no new evidence on the subject matter of the findings. In brief, the former findings were adopted on sufficient evidence.
Trial Commissioner Cooper acted with generosity to the plaintiff, in offering it the opportunity of introducing evidence to show error in the former findings of fact. The plaintiff’s response — an objection to the former findings, without the production of any new evidence, and a demand for proof — was a default which left the plaintiff with no valid complaint, for the findings which are now criticized were adopted on the basis of supporting record evidence.
Because it is best, as always, that rules of law be evolved only as required by the case presented, especially in such an equitable and flexible proceeding as a Congressional Beference, we emphasize that our decision goes only so far as to hold that the claimant cannot complain of the treatment accorded it. We do not mean to hold — because it is unnecessary — that the principle of res judicata does not apply in a Congressional Beference proceeding which follows a proceeding at law, and we also express no opinion on the amount of and the weight to be given to any new evidence which under the procedure followed by the trial commissioner might be presented against a former finding. Our ruling is limited to a dismissal of the claimant’s objection to the procedure followed by the trial commissioner, and, on the whole case, to an approval of the decision on trial.
The Senate is informed that the members of the Beview Panel unanimously agree with and adopt the trial commissioner’s findings, opinion and conclusion, which are included herein by reference, and which together with the foregoing remarks form the basis of our recommendation *667 that tbe claimant has neither a legal nor an equitable claim against the United States, and that any payment on the claim could be a gratuity.

The opinion, findings of fact, and conclusions are submitted under the order of reference and tlie Rules of the Chief Commissioner. The findings of fact are not printed here. The parties stipulated that the entire record in Crown Coat Front Co. v. United States, 154 Ct. Cl. 613, 292 F. 2d 290 (1961), is to be included in and considered a part of the record in this case. Findings from the earlier decision, where material, relevant, and supported by the entire record as a whole, have been adopted herein.

 ASBCA No. 4445, 58-2 BCA ¶ 1898.

 ASBCA No. 8090,1963 BCA ¶ 3681.

 Crown Coat Front Co. v. United States, 363 F. 26. 407 (2d Cir. 1966) (en banc) ; 386 U.S. 603 (1967) (rev’d and remanding) ; 275 F. Supp. 10 (S.D. N.Y. 1967) (on remand) ; aff’d. 395 F. 2d 160 (2d Cir. 1968), cert. denied, 393 U.S. 853 (1968)

 Apparently relying on the testimony of a Government witness to the effect that it was standard procedure for the Government to administer the Parr chloride test after the colorimetric method showed unsatisfactory results, this court, in Ct Cl. No. 222-58, made a finding that both tests had in fact been used. Both parties now agree this is in error as only the colorimetric test was performed.

 On one occasion, plaintiff did request a retest and defendant promptly complied. Before the retest was completed, plaintiff offered a price reduction.

 Plaintiff has stipulated that it has no legal claim against the United States.

 In view of the conclusions reached, it is unnecessary to resolve the unpaid tar issue urged by defendant as a “set-off.”